Earl W. Brown et al, Appellees, v. Sheldon State Bank et al, Appellees, Peoples Savings Bank of Sioux City et al, Appellants.

**Banks and banking:** insolvency: preferred claims. The issuance
1   of certificates by a bank, in form certificates of deposit, which are forwarded to a correspondent bank with the understanding that credit will be given the issuing bank on an open checking account, which is in fact done, constitutes a loan of money and not a deposit.

**Same:** claims due insolvent banks: set-off. It is the rule to
2   allow a set-off where parties are mutually indebted and one becomes insolvent regardless of whether the indebtedness sought to be cancelled by set-off is due or not: and a correspondent bank indebted to an insolvent bank on open account may apply the rule as well as an individual, and in neither case is the amount due entitled to be established as a preference claim against the estate of the insolvent.

**Same:** insolvency: preferred claims: trust funds. Where the
3   proceeds of a draft sent for collection by a correspondent bank and remittance to it are in the possession of the collecting bank at the time of its insolvency, and pass into the hands of the receiver, the proceeds of the collection become a trust fund, and the correspondent bank is entitled to have

its claim established as a preference against the assets of the insolvent bank in the hands of the receiver; and a settlement for the collection is not effected by forwarding a draft therefor drawn on a bank which, on being presented for payment within a reasonable time, is repudiated for want of funds.

**Same:** SCHOOL FUNDS. A general checking deposit of school funds in a bank by the treasurer of the district does not constitute a trust fund; and on failure of the bank neither the treasurer nor the township has a preference claim over other creditors to the assets in the hands of the receiver.

**Same:** COUNTY FUNDS. While the deposit of county funds by the treasurer in a bank without authority of the supervisors, as provided by Code, section 1457, constitutes, as between the county and the bank, a trust relation and entitles the county to a preferred claim against the assets of the bank in case of its insolvency, still that relation does not extend to the treasurer; and where he is compelled to make good the loss to the county he cannot claim a preference over general creditors for the amount due from the insolvent bank.

**Same:** SUBROGATION. Subrogation is allowable only in favor of a surety, or one who has been compelled to advance money to pay the debt of another to protect himself, and not in favor of one who has discharged an obligation for which he was personally liable; so that a county treasurer, who, personally liable for the safe keeping of the public funds, deposits the same in a bank without authority of the board of supervisors as provided in Code, section 1457, and upon insolvency of the bank is compelled to make good the loss to the county, will not be subrogated to the rights of the county thus enabling him to assert a preference claim against the assets of the bank.

**Same.** A lien for taxes is not assignable, it can only be enforced by the municipality: so that where a treasurer delivered to a bank in which he was in the habit of depositing funds, a receipt for taxes due from the bank, the amount of which was credited to his deposit account, upon insolvency of the bank and payment to the county of the item thus lost by the treasurer, he was not entitled to be subrogated to the rights of the county to enforce its tax lien.

**Banks and banking:** INSOLVENCY: COLLATERAL SECURITY: COST OF COLLECTION. In a receivership proceeding to wind up the affairs of an insolvent bank, the evidence is held to justify a finding that a correspondent held certain collateral of the insolvent bank as security for loans made at the time the security was deposited, and not as covering subsequently accruing indebted-

ness; and that while the correspondent is required to account for the collateral it was entitled to the reasonable and necessary costs in collecting the same.

**Same:** APPLICATION OF FUNDS. Where a bank wrote its correspondent advising it of the sending of a draft for credit on its open deposit account, and by inadvertence omitted to inclose the draft but retained the same until insolvency and it passed with other assets into the hands of the receiver, the letter of advice was not such an assignment of the draft as to entitle the correspondent bank to the proceeds of the draft for application on the indebtedness of the insolvent bank.

**Same.** Where a bank directs one correspondent with which it has a credit to remit a stated sum to another to cover overdrafts, which it does, and proper debits and credits are given by the three banks, the bank in whose favor the remittance was made acquires a lien upon the draft remitted to the extent of the overdraft, which no act of the issuing bank alone in recalling the draft can divest, so as to render the entire amount thereof subject to the claims of the general creditors of the bank ordering the remittance, upon its subsequent insolvency.

*Appeal from O'Brien District Court.*—Hon. F. R. Gaynor, Judge.

Thursday, July 9, 1908.

This action was originally brought in equity, by stockholders in the defendant Sheldon State Bank, located at Sheldon, O'Brien county, to wind up and settle the business and affairs of said bank, alleged to be insolvent. On application of the plaintiffs, R. W. Ady was appointed receiver, and given power usual in such cases. In due time the receiver gave notice to the creditors of the bank to present and file, with the clerk of the court, their claims and demands, duly verified, etc. In response to such notice various creditors filed their claims, in some instances denominating the same as such, and in others the term " petition of intervention " being employed. Hearing being had upon the claims, some thereof were disallowed in whole or in part. Others were established as general claims only; preferences, as demanded,

being refused. The claimants aggrieved by the decree have united in bringing this appeal. In the opinion separate consideration will be given to each of the claims.— *Modified* and *Affirmed.*

*Jepson & Jepson,* for appellant Peoples Savings Bank.

*O. H. Montzheimer* and *E. C. Herrick,* for appellant L. T. Aldinger.

*O. H. Montzheimer,* for appellant Cedar Rapids National Bank.

*John E. Orr* and *Gerrit Klay,* for appellant School Township of Lynn.

*David Algyer* and *Herrick & Herrick,* for appellant Julius Mark.

*Shull, Farnsworth & Sammis* and *Newman, Northup, Levison & Becker,* for appellants National Bank of the Republic and Security National Bank.

*W. D. Boiles,* for Ady, Receiver, appellee.

BISHOP, J.— A motion to dismiss the appeal has been submitted with the case. We have examined into the grounds on which the motion is predicated, and reach the conclusion that it should be overruled. We need not enter upon a detailed discussion of such grounds.

First in order of presentation is the claim of the People's Savings Bank of Sioux City. This claim is based upon two instruments in writing, purporting, in usual form, to be certificates of deposit issued by the Sheldon bank. One thereof bears date September 5, 1903, and recites that " People's Savings Bank, has deposited in the Sheldon State Bank five thousand dollars, payable to the order of itself three

months after date with interest at 6 per cent.," etc.
" [Signed] Ed. C. Brown, Pr." The other bears date October 30, 1903, and is in the same form, and for the same amount as the first. On the first is an indorsement of credit in the sum of $2,717.53, and this, claimant alleges, represents " the credit balance to which said Sheldon State Bank was entitled on open account." The demand of claimant is for allowance of its claim as a deposit with preference, as provided for by statute. The demand for preference is resisted by the receiver, his contention being that the certificates evidence loans of money merely, and not deposits; accordingly, that the claimant should be assigned to the position of a general creditor. In the nature of a cross-demand it is charged, by the receiver, that at the time of his appointment the Sheldon bank had on deposit, on open account with the claimant bank, the sum of $2,717.53, to which he, as receiver, became entitled; that thereafter the claimant bank, without right or authority, attempted and pretended to appropriate said money, by crediting the amount therof on the first of said certificates. An order requiring payment of said sum of money to the receiver, to be applied by him to the payment of a depositor's claims, is demanded. The claimant bank in reply, insists that the certificates represent actual deposits; that they were executed in the usual and ordinary course of business, and entered of record, reported upon, and treated in all respects as certificates of deposit. It admits that the credit on the first certificate of the deposit balance was made after the failure of the Sheldon bank, but insists that it had right to so appropriate and credit. The decree denied preference, and established the claim for the face amount of the certificates, with interest, as a general claim. And the claimant was ordered to pay over to the receiver the amount of the deposit account in its hands at the time of the failure.

Going to the evidence, it appears that the certificates in question are renewals of others previously issued, and it is

reasonably clear that the issuance of each of the original

1. BANKS AND
BANKING:
insolvency:
preferred
claims.

certificates was on the suggestion of the Sheldon bank. Brown, the president of the bank, called by the receiver, testifies that the claimant bank was one of the Sioux City correspondents of his bank, and that he had an understanding with the president of said claimant bank to the effect that "whenever I wanted any money, he would try and take care of me." And he says that pursuant to such understanding, the original certificates were drawn up, and sent to the claimant bank, with the request that the sum named therein be placed to the credit of the Sheldon bank; that such credit was given, and the money was thereafter drawn out, by check or draft, as occasion arose therefor; that upon arrival of the time named in the certificates for payment, these renewal certificates were drawn up and forwarded, whereupon the claimant bank, after charging interest to the open account of the Sheldon bank, returned to it the original certificates. Taking this to be the fact situation, it becomes manifest that the transactions out of which grew the certificates in question amounted to loans of money. The certificates represent money borrowed, and not deposits. The facts of the case do not differ, in any material respect, from those appearing in our recent case of *State v. Corning State Savings Bank,* 136 Iowa, 79. We there held that a transaction involving the issuance of a certificate — in form a certificate of deposit — by the Corning bank, which was forwarded to the Des Moines National Bank, with the understanding that a credit on open checking account should be entered in its favor, amounted to a loan of money, and not a deposit. The subject is elaborately discussed in the opinion in that case, and we need not, at this time, repeat the argument on which the conclusion was made to rest. See, also the opinion on a further appeal in the same case. 139 *Iowa,* —.

Considering, now, the contention for error in the order requiring the claimant bank to pay over the deposit fund in

its hands at the time of the failure, we think the contention
should be sustained.   It is the rule in this
State, as it is in many other jurisdictions, to
allow set-off where parties are mutually in-
debted and one becomes insolvent.   And it is not material
that the indebtedness, sought to be canceled by offset, is not
due at the time.   *Thomas v. Bank,* 99 Iowa, 202; *Wikel v.
Garrison,* 82 Iowa, 453; *Swentzel v. Bank,* 147 Pa. 140
(23 Atl. 415, 15 L. R. A. 310, 30 Am. St. Rep. 718);
*Thompson v. Trust Co.,* 130 Mich. 508 (90 N. W. 294, 97
Am. St. Rep. 494); *Davis v. Mfg. Co.,* 114 N. C. 321 (19
S. E. 371, 23 L. R. A. 322); *North Chicago Co. v. St. Louis
Co.,* 152 U. S. 596 (14 Sup. Ct. 710, 38 L. Ed. 565);
*Van Wagoner v .Gaslight Co.,* 23 N. J. Law, 294.   The
case last cited involved a bank failure, and it was said:
" In cases of cross-indebtedness the assets of the bank con-
sist only of the balance of the accounts.   That is all the fund
which the bank itself would have had to satisfy its creditors
in case no receiver had been appointed.   And there is no
equality, and no equity, in putting a debtor of the bank, who
has a just and legal set-off as against the corporation, in a
worse position, and the creditors in a better position, by the
failure of the bank and the appointment of a receiver."

Next in order is the claim of Julius Mark.   The claim
here in controversy is based upon what purports to be a
certificate of deposit.   The receiver filed a resistance, claim-
ing that the certificate represented no more than a loan.
The evidence shows the transaction, out of which the certifi-
cate arose, to be substantially like that appearing in the case
of the claim of the *People's Savings Bank, supra.*   The
court rightly decreed that claimant was entitled to place only
as a general creditor.

Next in order is the claim of the Cedar Rapids National
Bank.   The facts of this claim are that on November 2,
1903, the claimant bank sent by mail, to the Sheldon bank,
for the purpose of collection and return, a draft, drawn by a

2. SAME: claims
   due insolvent
   banks: set-off.

third person on the First National Bank of Sheldon, and held by the claimant bank under endorsement. The letter of transmittal, with inclosure, reached the Sheldon bank on November 3d; and, a few minutes before the bank closed its doors for the last time, the draft was presented to the First National Bank, and paid. On receipt of the money the Sheldon bank issued and mailed to claimant its draft in a corresponding amount, payable to claimant, and drawn on the National Bank of the Republic, Chicago. This draft reached the claimant bank on the following day, and was forwarded to Chicago, where, on November 6th, it was presented to the bank on which drawn, and payment was refused for want of funds. The demand of claimant is that the claim be allowed and paid in full, as one entitled to preference over all other creditors. By the decree the demand for preference was denied, and the claim was established only as a general claim. No good reason appears to us for denying the demand for preference. The money collected from the First National Bank was certainly in the hands of the Sheldon Bank when it closed its doors, and such money passed into the hands of the receiver. And it was a fund held in trust, and therefore entitled to the preference demanded. *Nurse v. Satterlee,* 81 Iowa, 491; *Whitcomb v. Carpenter,* 134 Iowa, 227. The cases cited by council for the receiver are not in point. In each thereof the facts made it appear that the collection items had been sent on with instructions to collect and credit to account. Counsel for the receiver seems to think that there is something in the fact that a draft was at once drawn and sent forward that serves to warrant the denial of preference. We do not see how this can be. It may be, as counsel suggests, that had the draft so drawn been presented for payment on the day it was drawn, or even on the following day, it would have been paid. But that cannot be accepted as ground sufficient on which to defend the decree. The Sheldon bank chose to make returns of the collection by Chi-

*Margin note: 3. SAME: insolvency: preferred claims: trust funds.*

cago draft. Of necessity two days, at least, must elapse before such draft could be presented. In the meantime the bank had drawn out of the Chicago bank its funds available to meet the draft. As far as claimant is concerned, therefore, the case stands precisely as if the Sheldon bank had never had any funds in the Chicago bank. It requires no citation of authorities to make it clear that settlement, as for a collection made, is not accomplished by forwarding a draft, which, on being presented for payment within a reasonable time, as was this, is repudiated for want of funds. We conclude that the preference should have been allowed.

Next in order is the claim of the School Township of Lynn, Sioux County. The facts of this claim, stated in brief, are as follows: During the year 1903 one Maus was 4. SAME: treasurer of the claimant school township. school funds. Following a practice that had prevailed under former treasurers, Maus deposited the moneys coming into his hands as treasurer in the Sheldon bank, and the same were credited to him, as treasurer, on the books of the bank. Within his understanding, and in fact, such moneys were treated in all respects as ordinary deposits, and mingled with the general funds in the possession of the bank. And such had been the practice under former treasurers. Of this practice the other officers of the district were fully advised. Pursuant to what seems to have been a general understanding, the course of business was that when school orders were drawn, they were presented direct to the bank, and paid, and charged to the account of Maus. The treasurer's book of accounts was also kept by some one connected with the bank. At the date of the failure of the bank the account of Maus showed a credit balance of $1,505.60. The contention of claimant is that the sums of money so deposited became a trust fund in favor of claimant, and the balance appearing should be treated and paid in full as such. The receiver admits the deposits, but denies that a trust fund was thereby created. The decree assigns place to the claim as an ordi-

nary deposit.   We think there was no error in this.   Unlike
a county treasurer, a school treasurer is not forbidden by
law to deposit in a bank the public moneys coming into his
hands as such; the deposit being made in his name as treas-
urer.   The deposits made by Maus were not therefore wrong-
ful, and no trust arose, either in his favor, or in favor of
the school township.   Under the circumstances disclosed he
stands in the relation of an ordinary depositor, and the town-
ship cannot acquire any higher rights by electing to make
claim to the deposit rather than to demand an accounting at
his hands.   The principles involved are so exhaustively dis-
cussed in our recent cases of *Officer v. Officer,* 120 Iowa, 389,
and *Hunt v. Hopely,* 120 Iowa, 695, that we need not again
go over the subject.   Those cases are decisive of the case
before us.

   Next in order is the claim of L. T. Aldinger.   During
the year 1903 this claimant was treasurer of the county of
O'Brien, having his office at Primghar, the county seat.   The
5. SAME:                books of the Sheldon bank show that within
  county funds.         the period beginning May 31, 1903, and end-
ing with the date of the failure, there was deposited in the
bank, to the credit of claimant as county treasurer, on open
account, the total sum of $6,122.99.   As against this, checks
had been drawn from time to time, and paid, so that, at the
close of business, there remained a credit balance of $2,-
688.54.   And the claim, as filed, is for this balance.   With-
out dispute the deposit account was made up in this way:
On June 4, 1903, claimant made a cash deposit on open ac-
count, and also surrendered a certificate of deposit, thereto-
fore issued to him by the bank, and the amount of which was
placed to his credit on the open account.   The cash was
money collected by the treasurer in his official capacity, and
the certificate of deposit also represented money so collected.
Thereafter — and conforming, as it appears, to a custom
long prevailing in the county, and known to the members
of the board of supervisors of the county — claimant made

out, from time to time, from the tax books of the county, tax receipts showing payment of taxes by taxpayers residing in and about Sheldon, and these he signed, and sent to the Sheldon bank by which bank they were, in turn, delivered to the respective taxpayers, upon payment of the amount called for.   As thus collected by the bank, the amounts were passed to the credit of claimant in the deposit account.   One of the credit items in the account is for $507.98, and it appears that this represented the amount of the taxes due the county from the bank.   On request the tax receipt had been sent to the bank by claimant, and the amount was simply carried to his credit in the account.   The contention of claimant is that the deposits of public funds so made was without express authority of the board of supervisors of the county; that said funds were present in the cash items of the bank on hand at the time of the failure and constituted and were a trust fund payable in preference to the payment of any other claims against the bank.   Respecting the credit in the account as for taxes due from the bank, it is contended that the transaction did not amount to a payment, and that the amount of such taxes still remains due and unpaid.   It is then alleged that the term of office of claimant expired in January, 1904; that he was compelled by the board of supervisors to and did, under protest, pay to the county the full sum of the balance of said deposit account, whereby he became subrogated to all the rights and title of the county, including the right to recover said sum of $507.98, as taxes due and unpaid, and the remainder as of a trust fund.   By the decree the claim was established, in the sum of $2,180.56, as a depositor's claim, and on the bank tax item, in the sum of $507.98, as a general creditor's claim.

To our minds it is plain that there was no error in the decree of which claimant can complain.   Code, section 1457, in effect, forbids the deposit of public funds by a county treasurer in a bank, except when authorized thereto by a recorded resolution, adopted by the board of supervisors, and a

bond has been given, etc. Here claimant does not pretend to have had any such authority. Not only were the deposits made by him on his own motion, but the evidence makes it clear that they were so made with the understanding that the moneys would be commingled with the general funds of the bank, and dealt with, in all respects, as a general deposit. A deposit of public moneys thus wrongfully made by a county treasurer does not give rise to any contract rights — as a depositor, or otherwise — in favor of the county. As between the county and its treasurer, the transaction amounted, in contemplation of law, to a conversion. As between the county and the bank, the relation, at best, is that of trustor and trustee under a resulting trust; this assuming, of course, that the bank had notice, at the time of the deposit, of the character of the moneys deposited. That out of such a relation there arises a right of preference, in favor of the county, over ordinary depositors we conclude to be true under the authorities. *Page Co. v. Rose,* 130 Iowa, 296, and cases cited. As between the treasurer and the bank, however, no trust arises. There is no more than the simple relation of depositor and depositary.

Counsel for appellant do not dispute these propositions, but they insist, as we have seen, that as claimant was compelled, at the close of his term of office, to pay over to the county the amount shown by the deposit account, he became entitled to be subrogated to all the rights of the county. And, as bearing upon this, counsel point out that, at the time of making settlement with the county, he was told by the board of supervisors that, upon payment, " I would have the same right to go ahead with the collection of the money for myself, the same as the county might do. They told me to go ahead and enforce the collection." To the situation, as thus presented, it is manifest to our minds that the doctrine of subrogation can have no application. Subrogation is allowable in equity, only in favor of a person who has advanced money to pay the debt

6. SAME: subrogation.

of another, to whom he stood in the position of surety, or where he has been compelled to pay the debt of another to protect his own rights. 27 Am. & Eng. Ency. 202. It is never allowed in favor of a person who is himself personally liable for the debt he discharges by payment. *Bolton v. Lambert,* 72 Iowa, 483, *Bank v. Bank,* 124 Cal. 147 (56 Pac. 787, 45 L. R. A. 863, 71 Am. St. Rep. 36). Nor in favor of one who would thereby reap advantage in any way from his own wrongdoing. Thus a collector of internal revenue, who had paid to the government certain public moneys, which had been unlawfully deposited in a bank that had subsequently failed, was held not entitled to subrogation to the right of the United States, to claim a preference against the assigned effects of the insolvent bank. *Wilkinson v. Babbitt,* 4 Dill. (U. S.) 207 (Fed. Cas. No. 17,668). And a guardian who has made an unwarranted investment of the funds in his hands, and who has been compelled to account for such funds, cannot be subrogated to the benefits of the investment. *Rowley v. Towsley,* 53 Mich. 329 (19 N. W. 20). See also, *Guckenheimer v. Angevine,* 81 N. Y. 394; *Bank v. United States,* 148 U. S. 573 (13 Sup. Ct. 702, 37 L. Ed. 564); Sheldon, Subrogation, section 44.

Here the facts fall far short of showing claimant entitled to shelter himself under the rule of subrogation. In making settlement with the county, he did no more than to satisfy and cancel his own obligation. He paid over a sum of money, in lieu of moneys which had been collected by him, as shown by the books of his office, and of which, as shown by the evidence, he had made wrongful disposition. And this he did voluntarily. He was not compelled to make the payment except in the sense that every man is compelled to meet and cancel the legal and valid obligations existing against him when properly called upon so to do. And he is not aided by what was said to him on the part of certain of the members of the board of supervisors. As we have seen,

there were no contract relations between the county and the bank; and no right to proceed against the bank arose in favor of the county until there had been a failure, on the part of its treasurer, to account for the public money coming into his hands. Claimant, as an outgoing treasurer, accounted promptly, thereby discharging his own obligation, and satisfying every right, legal and equitable, possessed by the county. There was, then, nothing to assign, and we need not stop to consider what otherwise might have been the legal effect of what was done on the part of members of the board.

Coming to the bank tax item, appearing in the deposit account in favor of the county as against its treasurer, it is clear that the transaction amounted to a collection by the latter. And, as we have seen, the amount was included in the settlement made with the county by the treasurer. Here, also, there arose no right of subrogation. It is undoubtedly true that the right of the county to enforce its lien as for taxes due and unpaid could not have been defeated by merely exhibiting the tax receipt in the hands of the bank, and the credit entry appearing in the deposit account. Conceding, then, that the right to a lien was not wholly extinguished by the accounting made by the treasurer at the expiration of his term of office, still payment by such treasurer could not give rise to the right of subrogation, for the simple and sufficient reason that the right of the county was not one capable of assignment. The right of the county is measured, not by contract, but by statute. And it is the right only to assess and collect. This right — inclusive of the power to enforce the tax lien — cannot be farmed out to private individuals. " It would be a startling proposition to affirm that a city could, for example, sell and assign its tax list to an individual, and authorize him to exercise the high and delicate powers conferred upon the corporation. Why not? The legal answer is that these powers are conferred upon the municipality, to be exercised by it, not to be delegated by it to others." *McInerny v. Reed,* 23 Iowa,

*7. SAME.*

410.   It ought not to require argument to make it clear that, where there is no right or power of assignment, there can arise no right of subrogation.   As said in *Trust Co. v. Hart,* 76 Fed. 673 (22 C. C. A. 473, 35 L. R. A. 352): "Inasmuch as a public tax is a debt of such a character that it cannot be assigned, . . . a case must be very exceptional and peculiar when the right arises to be subrogated to the lien of the State or a municipality.   It would certainly be contrary to sound public policy to concede that a collector may accept payment of taxes in a mode not authorized by law, and thereafter, when confronted with a possible loss, be allowed the right of subrogation."   See, also, as announcing the same principle, *Wallace's Estate,* 59 Pa. 401; *Hinchman v. Morris,* 29 W. Va. 689 (2 S. E. 683); *Insurance Co. v. Middleport,* 124 U. S. 534 (8 Sup. Ct. 625, 31 L. Ed. 537); Sheldon, Subrogation, section 240.   From what has been said it follows that there was no complainable error in the decree.

Next and last in order is the claim of the National Bank of the Republic of Chicago.   The issues here are somewhat involved, and a statement thereof seems necessary to a correct understanding.   The claim is upon three certificates of deposit — such in form — and in each it is certified that W. T. Fenton, vice-president of the claimant bank, has deposited in the Sheldon bank the sum of $5,000, payable to the order of himself, six months after date, also one promissory note executed by the firm of J. W. Fix & Co., as makers, to the Sheldon bank, for $5,000, and indorsed in blank by that bank to claimant.   It is alleged that, as collateral security for the payment of said certificates and said note, and any other indebtedness due it, the Sheldon bank assigned and delivered to claimant certain promissory notes, made by the persons and for the amounts, as shown by a list attached to the pleading filed.   It is further alleged that, in addition to said collateral notes, the Sheldon bank, before closing its doors, but on the same day, indorsed to claimant a certain draft

for $796, drawn upon the bank of Landenberg, Thalmann & Co., New York; that it charged the amount thereof to claimant on its books, and notified claimant by letter that such draft had been transmitted to it for credit; that inadvertently said draft was not so transmitted, and the same was taken possession of by the receiver upon his appointment; that the New York bank held on deposit funds sufficient to meet said draft when presented. Claimant says that it has made demand for said draft, which demand has been refused; that the receiver has deposited said draft in the First National Bank of Sheldon, and obtained credit therefor, and said bank claims to be the owner of the draft and the fund represented thereby. Further, claimant alleges that prior to the failure, the Security National Bank of Sioux City sent claimant a draft, drawn on the Merchant's, etc., Bank of Chicago, for $1,000, to be placed to the credit of the Sheldon bank; that before claimant could collect said draft, said Souix City bank, having learned of the failure of the Sheldon bank, stopped payment of said draft; that thereafter said Sioux City bank agreed to allow collection of said draft, upon execution to it by claimant of a writing of indemnity, which was done. Said writing, in substance, was as follows:

Whereas, the Security National Bank did, on November 3, 1903, remit its draft on Merchant's, etc., Bank for $1,000 to National Bank of the Republic for account of the Sheldon State Bank, and, whereas, payment of said draft was stopped by said Security Bank, and, whereas, said Sheldon Bank is indebted to the Security Bank in the sum of $4,000, secured by various notes which are believed to be ample, and whereas, said Security Bank has this day withdrawn its directions to said Merchant's Bank to refuse payment on said draft and will permit the same to be paid, now, therefore, the National Bank of the Republic hereby agrees to indemnify said Security Bank fully, but to the extent of $1,000 against the loss upon said note of the Sheldon Bank, and second, against any loss or damage or expense that may be incurred by said

Security Bank in turning said draft back to the National Bank of the Republic and permitting it to be paid. [Signed] National Bank of the Republic. Nov. 7, 1903.

The prayer is that claimant may have leave to interplead the First National Bank of Sheldon, the Security Bank of Sioux City, and Landenberg, Thalmann & Co.; that the certificates of deposit held by it be established as such, and that the Fix & Co. note be established; that it may be adjudged to hold, as collateral security to all such indebtedness, and any other shown to be due to it, the promissory notes in its hands, and the said drafts for $796 and $1,000, respectively. The receiver, in pleading, denies that the three certificates represent deposits in the Sheldon bank, and asserts that such evidence mere loans of money, admits the Fix note as an item of general indebtedness, but denies that the promissory notes held by claimant were given or are held as collateral to such note, denies that claimant has any title or interest in the said draft for $796 and admits that he has deposited the same in the First National Bank, and received credit for the amount thereof. Respecting the $1,000 draft, he alleges that on November 3, 1903, the Sheldon bank had on deposit, on open account, with the Sioux City bank, more than the sum of $1,000; that on that day the Sioux City bank, on request of the Sheldon bank, forwarded to the claimant bank the draft in question, but on learning the next morning of the failure, it stopped payment, and by letter notified claimant of the situation, and requested the return of the draft, which request was complied with; that on November 7th, and after having been indemnified by claimant, said Sioux City bank, without right or authority, again forwarded said draft to claimant, by whom it was collected.

The receiver also filed a cross-bill, as against claimant, asking that his right to said drafts be established. Claimant, in reply and answer to the cross-bill, reasserted its right to the $796 draft, and further alleged that indorsement of the draft to it was actually made on the back thereof, and

that the failure to inclose and forward the draft with the letter of advice was an oversight. Respecting the $1,000 draft, claimant says that the Sioux City bank had no right or authority to stop payment; denies that the draft was ever surrendered to the Sioux City bank, but was returned to it for the sole purpose of an adjustment, whereby payment thereof to claimant could be brought about. Further, claimant says that, on receipt of said $1,000 draft, on November 4th, the same was credited to the open account of the Sheldon bank, and that, at the close of business on that day, the account showed a credit balance of $457.32; that it did not know of the failure until after business hours. The Security National Bank, impleaded, answered the pleading of claimant, admitting that it stopped payment of the $1,000 draft by telegram addressed to the Merchant's, etc., Bank. And it says that it refused to allow said draft to be cashed, unless the claimant bank would indemnify it " against any loss it might have in the event collateral, held by it, was not sufficient to pay the indebtedness of the Sheldon bank to it; " that the claimant bank refused to deliver up said draft, but did agree to and did execute such indemnity; that there was no agreement by which claimant should waive any interest in said draft, except as expressed in said writing of indemnity. And it is said that the obligations of the Sheldon bank to it were fully satisfied from the collateral in its hands. Following this answer, the receiver filed a cross-bill against the Sioux City bank, alleging, in substance, that said draft was, by claimant bank, voluntarily surrendered back to said Sioux City bank without question or reservation, and denying right or authority to redeliver said draft. To such bill the defendant bank answered, reaffirming, with some elaboration, the allegations of its answer to the pleading of claimant bank. The First National Bank of Sheldon, impleaded, for answer and cross-bill, admitted its possession and claim of ownership of the $796 draft; that the same was presented to it by the receiver, properly indorsed by him,

and accepted in due course, without notice that any person other than said receiver had any right, title, or interest therein.   To this cross-bill the claimant bank answered, alleging that the indorsement made to it on the back of the draft was erased by E. C. Brown, president of the bank, after the receivership, and without authority, and that the same was without effect; that such erasure was with full knowledge of the receiver.   Claimant further states "that the Sheldon bank on the strength of the credit, as shown on its books, of said draft, drew items of exchange upon claimant, many of which were paid before notice of the failure."   And, based on this state of facts, it is said that an estoppel arose in its favor.

By the decree, the certificates of deposit held by claimant were adjudged to evidence loans of money, and not deposits in the Sheldon bank.   The collateral security in the form of notes held by claimant was adjudged to be collateral only to the indebtedness represented by the certificates of deposit, Claimant was ordered to account to the receiver in respect of all moneys collected on the collateral notes, and the whole amount collected was order to be applied in payment of the indebtedness represented by the certificates, without any deduction on account of costs or expenses of collection.   An itemized statement, under oath, respecting said matters, was ordered filed within a time fixed.   Further, it was adjudged that the $796 draft was the property of the First National Bank of Sheldon, and payment thereof by Landenberg, Thalmann & Co. was decreed.   The receiver was adjudged to be entitled to have the proceeds of the $1,000 draft, and payment thereof by the National Bank of the Republic and the Security National Bank, was decreed.   The circumstances attending the issuance of the certificates of deposit were not, in any material sense, different from those which obtained in the case of the People's Savings Bank, *supra.*   And the claim here must be ruled by the conclusion reached on consideration of the Savings Bank claim.

We think that the court did not err in holding that the Fix note was not secured by the collateral notes in the hands of claimant.   It seems that prior to December 12, 1902, it had

8. BANKS AND BANKING: insolvency: collateral security: cost of collecting.

been a more or less frequent thing for the Sheldon bank to send its certificates of deposit to the claimant bank, unaccompanied by security, which certificates were accepted as received, and the amount thereof, less interest to maturity, placed to the credit of the Sheldon bank.   And these certificates were spoken of and treated as evidences of loans.   On the day named the claimant bank wrote the Sheldon bank, saying:   ".  .  .  We are prepared to let you have some more money, in case you actually need it.  .  .  .  Heretofore we have never asked your bank to comply with our custom with regard to collateral, and I would suggest that if you need additional accommodation, you send us in a package of your customer's notes, to be held as collateral to whatever loans you may have in the bank.  .  .  .  It is an unusual thing for us to make loans to banks without taking their customer's notes."   At the time of the writing of this letter, the Sheldon bank was obligated to claimant on certificates of deposit only.   It is true that on occasions claimant had discounted notes drawn payable to the Sheldon bank, signed, in some cases, by Fix & Co., and in others by Big Four Milling Co., but the indorsement on such notes was, in each case, by E. C. Brown alone.   Responding to claimant's letter, the bank sent in a package of notes, and a line of such securities was maintained down to the time of the failure. About May 1, 1903, the Sheldon bank sent claimant a note of Fix & Co. for $5,000, indorsed by E. C. Brown, and asked discount thereof.   Claimant declined, and returned the note.   In a letter of date May 8th, claimant was asked if it would carry the Fix note if indorsed by the bank.   To this claimant replied in the affirmative, and the note — being the note in question in this proceeding — was sent on, and the proceeds, less discount, credited to the account of the

Sheldon bank.   This is the situation presented by the com-
petent evidence in the record, and therein we find no war-
rant for holding that by agreement the security, afforded by
the collateral notes, was extended to cover the obligation of
the Sheldon bank as indorser on the Fix note.   Without an
agreement no right of security arose.   We think the court
was in error in refusing to claimant allowance for the reason-
able and necessary cost and expense of collection of the col-
laterals.   The rule is for allowance.   Jones on Pledges, 400.
Counsel for receiver does not dispute the rule, but insists that
the proof was lacking.   As we read the record, there was
proof of some cost and expense.   Instead of denial of an al-
lowance, therefore, the court should have examined the ex-
pense account and allowed so much, or all thereof, as it found
to be necessary and reasonable.

Respecting the draft drawn on the New York bankers
for $796, it appears that the Sheldon bank had cashed an
exchange item in that amount issued by the New York bank-
9. SAME:            ers, and, pursuant to a banking custom, the
   application
   of funds.        draft in question was drawn on November 3d
to effect a reimbursement.   As drawn, the draft was pay-
able to the order of the bank itself.   So far then, the claimant
bank had no interest in the matter.   After being drawn,
an indorsement was placed on the back of the draft, direct-
ing payment thereof to be made to the claimant bank.   With-
out doubt, it was the intention of the bank to forward the
draft to claimant for collection and credit, but by oversight
it was not inclosed with the letter of advice.   In our view
there is no way in which claimant could get any interest in
the draft — or the fund represented by it — prior to its
receipt and appropriation.   It was intended to be sent for-
ward simply as an item to be credited to the sending bank on
open deposit account.   The letter of advice cannot therefore
be tortured into an assignment of title and interest in the
draft and fund represented by it.   Such letter amounted to
no more than a notice of an intended deposit.   And the

deposit failed through oversight. It is manifest that the situation was so understood by the claimant bank, because no credit was entered in favor of the Sheldon bank on account thereof. Moreover, it appears that when the letter of advice was sent, the deposit account showed a balance in favor of the Sheldon bank. And it is not pretended that claimant changed its position in any way, relying upon the letter. It may be true that. the Sheldon bank drew checks upon its deposit account following the sending of the letter, but it does not appear that any such were paid.

Respecting the $1,000 draft, it appears that on November 2, 1903, the Sheldon bank, having a deposit account, with the Security Bank of Sioux City, ample for the purpose, wrote that bank as follows: "Please remit $1,000 to National Bank of the Republic for our credit." This letter was received by the Sioux City bank on November 3d, and on that day, in compliance with the direction, it forwarded to the claimant bank the draft in question. On the day of its letter the Sheldon bank charged the claimant bank with $1,000, and credited the Sioux City bank with the like sum. And the Sioux City bank, on sending the draft, charged the amount to the deposit account of the Sheldon bank. The draft was received by the claimant bank on November 4th, and credited on its books to the deposit account of the Sheldon bank. Thereafter it was presented for payment, but in the meantime the Merchant's Bank had been advised by the Sioux City bank to withhold payment. So, also, the Sioux City bank requested of the claimant bank a return of the draft, and this request was complied with. Explaining the action of the Sioux City bank, the president thereof testified, as a witness, that the bank held a note for $5,000 against the Sheldon bank, secured by a deposit of collateral notes; that upon learning of the failure, and being fearful that the collateral in its hands might prove insufficient to satisfy in full the $5,000 note, his bank took the step resulting in stopping payment of the draft.

10. SAME.

The draft was not canceled on its return, nor was the deposit account of the Sheldon bank given credit for its return. An agent of the claimant bank at once followed the draft to Sioux City. Upon learning the cause of the stoppage of payment, and pursuant to an agreement, the indemnity writing — set out above in connection with the statement of the issues — was drawn up, signed, and delivered to the Sioux City bank, and in return the draft was redelivered. On arrival of the agent in Chicago with the draft it was again presented, and paid. Without credit for the draft, the deposit account in the claimant bank was overdrawn, at the close of business, in the sum of $450; with credit there was a balance the other way in the sum of $550. On this state of facts we think the court below was in error in reaching the conclusion expressed by the decree. In carrying a deposit account with the claimant bank, the Sheldon bank was in duty bound to maintain the credit side of the account, in a sum ample to meet all drafts drawn thereon. In line of this, the draft was ordered sent forward, and the underlying agreement on which the account was maintained was a sufficient consideration therefor. When the Sioux City bank, in compliance with the order given, executed the draft and deposited the same in the mail, properly addressed, there was, in legal contemplation, and on plainest principles, a delivery thereof to the claimant bank. From that time on claimant had a lien thereon to the extent of any balance due it on the deposit account as of the time when the proceeds of the draft should come into its possession. The Sheldon bank, it will be observed, made no effort to recall the draft, and we need not consider what might have been the situation had there been an attempt, on its part, to do so.

This brings us to consider the effect on the rights of the parties of the recall by the Sioux City bank. And here it is to be remembered that all that took place was between that bank and the claimant bank. As far as appears, the Sheldon bank had no knowledge of what was going on until after the

transaction had been concluded. The theory of counsel for the receiver is that the voluntary return of the draft to the Sioux City bank had effect, in favor of the receiver, as a surrender of any and all rights the claimant bank may have become possessed of; that, as in the meantime the receivership had come into existence, the right and title to the draft became vested in the receiver at once, upon its surrender to the Sioux City bank. Hence there was no right in that bank to redeliver, or in the claimant bank to repossession. In our view this theory has no support in reason or authority. To begin with, the Sioux City bank had no possible right to stop payment of the draft, or to recall the same, in its own interests, unconnected with the issuance thereof. As to it, the case stood as though an agent of the Sheldon bank had appeared at its counter and bought the draft, paying cash. Its conduct, therefore, was purely gratuitous, and did not operate to affect the rights of anybody. Hence it is that the return of the draft did not have effect as a surrender in favor of the Sheldon bank or the receiver thereof. Most certainly there was no intention, on the part of the claimant bank, to make surrender of its rights in the premises. As matters stood, it was prevented from securing voluntary payment of the draft, and it had been presented with a request for return. In its dilemma it adopted the plan of making return, and sending out its agent to deal with the situation. The agent discovered that the Sioux City bank had acted without semblance of right or authority, and it is immaterial to any one, aside from the two banks involved in the transaction, what argument or means was adopted by the agent to secure repossession of the draft. These conclusions seem too plain to require the citation of authorities. It follows that the judgment against the Sioux City bank was error, and in favor of the claimant bank the decree should be so modified as to require said bank to account to the receiver only for the amount of the draft in excess of the deposit account overdraft.

Complaint is made of the requirement, put upon the

claimant bank by the decree, to furnish a full statement re--
specting the condition of the loan account, including the mat-
ter of collaterals.   We see no impropriety in this.

It follows that the decree must be, and it is ordered,
modified, in favor of the People's Savings Bank, to the ex-
tent of approving of the appropriation, by said bank, of the
deposit balance to the payment of the loan certificate, and
the establishment of the remainder of the certificates only as
a general claim.   In favor of the National Bank of the
Republic the decree is ordered modified so far as to confirm
the right of said bank, in the $1,000 draft, to the extent of
the overdraft appearing on the deposit account of the Sheldon
bank, and to account to the receiver for the balance, also to
the further extent of allowing claimant such cost and expense
as, upon further hearing, the court shall determine has been
necessarily and reasonably incurred in. making collection of
collateral notes.   In favor of the Cedar Rapids National
Bank, the decree is ordered modified to the extent of estab-
lishing the claim of that bank as one entitled to payment in
full, in advance of distribution among creditors.   In favor
of the Security National Bank the decree, as far as said
bank is affected thereby, is reversed.   In all other respects
the decree is affirmed.   The case is ordered remanded, for·
such further proceedings and decree, not inconsistent with.
this opinion, as the necessities of the case may require.—
*Modified* and *affirmed.*

LADD, C. J., taking no part.