RICHARD GOEMAN, Appellant, v. THE LIVE STOCK NATIONAL BANK, a corporation, Appellee.

No. 47091.

NOVEMBER 11, 1947.

John H. Adair, of Akron, for appellant.

Sifford, Wadden & Jepson, of Sioux City, for appellee.

MANTZ, J.—Richard Goeman, as plaintiff, brought suit against the Live Stock National Bank of Sioux City, Iowa, defendant, alleging that said bank had converted to its own use the proceeds of two drafts issued to him by Tyson Produce for products sold and delivered to Tyson Produce, said drafts being for $1,200.15 and $883.50. The defendant resisted the claim and denied specifically that it had in any manner converted to its own use the proceeds of said drafts. The jury was waived and the cause was tried to the court. The court found for the defendant. Plaintiff's motion for judgment notwithstanding the verdict, and that to amend the findings of fact were overruled and this appeal followed.

I. Before considering the legal propositions involved in this appeal we will briefly summarize the facts as shown by the record in order that the issues raised may be understood.

Richard Goeman, hereinafter referred to as Goeman, or appellant, a buyer and seller of eggs, located at Sergeant Bluff, Woodbury County, Iowa, on March 27, 1946, sold to Tyson Produce, a buyer located at Sioux City, a quantity of eggs and received as payment therefor a draft for $1,200.15; and on March 28, 1946, Goeman sold to said Tyson Produce like products and received in payment therefor a draft for $883.50. Both of these drafts were presentable through the defendant, the Live Stock National Bank of Sioux City, Iowa, hereinafter referred to as appellee, or Live Stock Bank, at which bank Tyson Produce had carried an account since April 1942. These two drafts were duly deposited by Goeman at the Pioneer Valley Savings Bank of Sergeant Bluff, Iowa, hereinafter referred to as the Pioneer Bank, on March 28, 1946, and March 30, 1946, respectively, and were credited to Goeman's account in said bank. Both were endorsed in blank to the said Pioneer Bank without reservation or restriction. The $1,200.15 draft was forwarded by the Pioneer Bank to appellee, along with various other items on March 29, 1946, and the $883.50 draft was sent to the same bank along with other items on March 30, 1946. The letters of transmittal from the Pioneer Bank to the Live Stock Bank bore the following heading: "We enclose for collection and credit." On Monday, April 1, 1946, these two drafts and other items were in the hands of the Live Stock Bank. Pursuant to custom that bank computed that the various items received and to be charged to the Tyson Produce account amounted to $44,044.99, being totaled about 12:30 p. m. on that day. Tyson Produce being advised of this amount, following the usual course of dealings between it and the bank, brought to the Live Stock Bank a check for such amount and was given the various items represented in said $44,044.99. This check was taken conditionally and book entries were made upon the bank records. A few hours later the Live Stock Bank discovered that Tyson Produce, beginning in the latter part of February 1946, had deposited with said Live Stock Bank eighteen fraud-

ulent drafts, each for $6,750, and had received conditional credit therefor. Selwyn Tyson of the Tyson Produce confessed to the officials of the Live Stock Bank the fraudulent nature of the eighteen drafts. Each draft purported to be in payment of a carload of eggs, allegedly shipped to Peter Fox Sons Company of Chicago. As a matter of fact, no eggs had been sent to said consignee. Immediately following the discovery of the fraudulent transaction, the Live Stock Bank returned to Tyson Produce the $44,044.99 check and demanded and received the various items included in said check, among which were the two drafts in controversy. At the same time the Live Stock Bank canceled the conditional credit given Tyson Produce earlier in the day, following which the two drafts involved were returned to the Pioneer Bank and such bank delivered them to appellant.

On April 4, 1946, by involuntary petition, Tyson Produce was adjudicated bankrupt. The record shows that said concern was bankrupt on and prior to April 1, 1946.

II. On March 1, 1946, appellant gave to the Pioneer Bank his signature card upon which was printed the terms and conditions under which accounts between appellant and such bank were to be carried on. Among other things said signature card bore the following: ''All items are credited subject to final payment in cash or solvent credit.''

The Pioneer Bank was a correspondent bank of appellee and cleared through it. It was not a member of the Federal Reserve. Between these two banks there was a written contract covering the handling of accounts between them. A part of said contract is as follows:

''All items are received for credit by The Live Stock National Bank, hereinafter referred to as the Bank, subject to final payment as follows: All checks or items are received by The Bank as its customer's agent, at customer's risk, and are credited conditionally subject to final payment, and may be charged back at any time until the proceeds thereof in money have been actually received.''

On April 8, 1942, when Tyson Produce opened an account with the Live Stock Bank it signed an agreement with such

bank covering the handling of items and accounts between them. Among its terms we find the following:

"Checks and drafts on The Bank will be credited conditionally. If not good at close of business, they will be charged back to the depositor and the latter notified."

The contract between the Pioneer Bank and the Live Stock Bank is the one usually used by the banks locally throughout the country.

III. At the time the drafts were issued the Live Stock Bank was acting as correspondent bank for approximately one hundred ninety country banks, which banks maintained deposits therein and cleared through it. The Live Stock Bank handled between six and seven thousand items in the course of the average day.

The above recitals are not in dispute. Appellant claims that the records of the bank show that when the items including the two drafts were received by the appellee bank that bank paid same by crediting the amounts thereof to the Pioneer Bank; also, that at that time the Tyson Produce had in it ample funds to care for said disputed drafts and that the act of the Live Stock Bank in refusing to carry out said credit and in canceling same amounted to a conversion of funds belonging to appellant. On the other hand, appellee bank claims that the Tyson Produce credit was simply an ostensible credit subject to change, correction and charge-back, depending upon the status of the dealings between said bank and Tyson Produce; that the Tyson Produce ostensible credit was built up and created by the fraud of the Tyson Produce in inducing appellee bank to give conditional credit on the eighteen fraudulent drafts on Peter Fox Sons Company and that pursuant to contract and custom and usage between banks and customers, appellee bank had a right to cancel said ostensible credit. Appellee further denies that either of the drafts involved was paid and satisfied as claimed by the appellant.

IV. As above set forth the action is one at law for conversion. On appeal appellant sets forth various errors—the refusal of the trial court to render in favor of appellant a judg-

ment against appellee bank notwithstanding the verdict; the denial of the motion of appellant that the court amend its findings of facts and conclusions of law to conform to the claim made by appellant; the insufficiency of the evidence to sustain the finding of fact and conclusions of law of the trial court; the ruling of the court on the admission of certain exhibits and the sustaining of objections to the proffered testimony of a witness. Appellant argues that the finding of fact and conclusions of law fail to comply with Rule 179, Rules of Civil Procedure.

V. There is no real conflict in the record as to the facts. The controversy is as to their application to the legal principles involved.

The trial court, following a detailed finding of facts, set forth its conclusions of law. We set out such conclusions:

1. No legal relationship between the plaintiff and defendant is shown by the record in this case.

2. There is no evidence upon which the plaintiff's claim of conversion can be sustained.

3. The defendant, having been induced to extend conditional credit to Tyson Produce, by the fraudulent scheme of Tyson Produce, its depositor, had the right to charge back the fraudulent drafts against the depositor's account and any subsequent deposits therein.

4. The plaintiff has failed to prove a cause of action in favor of the plaintiff and against the defendant and judgment must be rendered for the defendant herein.

Primarily appellant based his action against appellee bank upon the alleged conversion of the proceeds of the two drafts received by him from Tyson Produce and by him deposited to his account in the Pioneer Bank of Sergeant Bluff, Iowa.

Appellant received the drafts involved and deposited them in his account in the Pioneer Bank unconditionally and without restriction. Both were negotiable instruments. He received credit in his account in said bank: According to his contract with the Pioneer Bank this credit was conditional and subject to the condition that the drafts were eventually made

1094

good and paid. The two drafts thus endorsed became the property of the Pioneer Bank and they had title thereto. Palo Alto County v. Ulrich, 199 Iowa 1, 201 N. W. 132; Thompson v. Cedar Rapids Nat. Bk., 207 Iowa 786, 223 N. W. 517; Acme H. & M. F. Co. v. Metropolitan Nat. Bk., 198 Iowa 1337, 201 N. W. 129. In the last-cited case, Vermilion, J., speaking for the court, discusses the question of the title to checks and drafts deposited where credit is given the depositor. In the case of Midwest Nat. Bk. & Trust Co. v. Niles & Watters Sav. Bk., 190 Iowa 752, 180 N. W. 880, there was a question of whether a check which had been endorsed "for deposit" passed title to the bank receiving it. The court held that such an endorsement passed the absolute title to the check to the bank. On page 761 of 190 Iowa, page 884 of 180 N. W., many cases are cited to support such rule.

██ ██ We are unable to conclude from the record that appellant has shown a conversion of the two drafts by appellee as charged by appellant. Appellant would be held to know that his bank would simply forward the drafts to some other bank. He knew that the credit given him by the Pioneer Bank was subject to final payment of the drafts deposited.

"Conversion is any distinct act of dominion or control wrongfully exerted over the chattels of another, in denial of his right thereto." Mulenix v. Fairfield Nat. Bk., 203 Iowa 897, 899, 209 N. W. 432, 433. Citing Brown v. Dubuque Altar Mfg. Co., 163 Iowa 343, 144 N. W. 613.

See, also, Lee v. Coon Rapids Nat. Bk., 166 Iowa 242, 144 N. W. 630; Peninsular Bank v. Citizens Nat. Bk., 186 Iowa 418, 172 N. W. 293, 19 A. L. R. 547; Hall v. Merchants State Bk., 199 Iowa 483, 202 N. W. 256, 38 A. L. R. 1093. The holding above quoted was again set forth in Leonard v. Sehman, 206 Iowa 277, 220 N. W. 77; 53 Am. Jur., Trover and Conversion, section 48. See "Conversion" 9 Words & Phrases, Perm. Ed., 506 et seq.

With the Pioneer Bank owning the two drafts they forwarded them, together with other items, to their correspondent

bank. The correspondent bank carried the account of Tyson Produce. The Pioneer Bank also had an account in appellee bank. The handling of the accounts between appellee and the Pioneer Bank was governed by the contract between said banks. Under it and pursuant to custom and usage, the items received from the Pioneer Bank were at once placed upon appellee's books subject to charge-back and review. The Pioneer Bank items were to be paid subject to various factors, such as funds on hand, conditional credits, etc. It could not be said that appellee had converted the proceeds of the two Tyson Produce drafts if there did not exist in the Tyson Produce account with appellee sufficient funds to satisfy such drafts. According to the record, at the close of the business day of April 1, 1946, Tyson Produce had no money in its account with which to pay its obligations.

Besides the Tyson Produce drafts were promptly returned to the Pioneer Bank. That bank returned them at once to appellant. Appellee had them in its possession but a few hours and without demand returned them to appellant's consigning bank. Appellee never at any time denied to appellant his right in and to such drafts. By promptly returning them to appellant he had the opportunity to proceed against the maker thereof. Bellevue Bk. v. Security Nat. Bk., 168 Iowa 707, 150 N. W. 1076; Dille v. White, 132 Iowa 327, 109 N. W. 909, 10 L. R. A., N. S., 510; Griffin v. Erskine, 131 Iowa 444, 109 N. W. 13, 9 Ann. Cas. 1193.

VI. Even assuming that appellant may properly maintain the present action of conversion against appellee, we think that the trial court was right when it held that appellee had a right to refuse to honor the two Tyson drafts. The trial court held that at the time the two drafts were received by appellee, Tyson Produce then had but an ostensible credit in appellee bank. Had this credit been valid and unquestioned the appellee bank could not have refused to pay the Pioneer Bank for the two drafts. The eighteen fraudulent drafts on Peter Fox Sons Company heretofore referred to, totaled $121,500. Against this sum appellee had charged back on April 1, 1946, the amount of $85,809.40, thus leaving in the hands of appellee over $35,000

of these fraudulent drafts. Nothing remained in the Tyson Produce account to charge them against—all of the deposit had .been absorbed in the charge-back. This charge-back was made during the afternoon of April 1, 1946, as soon as appellee was advised that the ostensible credit had been obtained by the use of fraudulent drafts drawn against Peter Fox Sons Company. Thereupon, the appellee at once demanded and received the items going to make up the Tyson Produce check for $44,044.99 given to appellee to take up charges against its account in appellee bank. The two disputed drafts were then sent to the Pioneer Bank and that bank delivered them to appellant. The $44,044.99 check of Tyson Produce was delivered to it. This check is Exhibit H in the record. We set it out:

"Sioux City, Iowa, 4-1-1946
Pay to the order of Live Stock Nat'l Bank $44044/99
Fourty four thousand fourty four & 99/100————Dollars
To The Live Stock National Bank located at Sioux City Stock Yards 41-4 Sioux City, Iowa.        ————————"

After Mr. Tyson told of the fraudulent Peter Fox Sons Company checks he returned to appellee the items received from the Pioneer Bank and his check for the $44,044.99 was handed to him. He at once tore the signature off and destroyed it. This act was entirely voluntary upon his part. He made no claim that the Tyson Produce account in the appellee bank had funds with which the items sent by the Pioneer Bank could have been paid.

Appellant claims that while the Tyson Produce credit existing on April 1, 1946, was ostensible, still it had in it sufficient valid amounts to take up the two drafts in controversy. He calls attention to the fact that on the same date appellee honored a draft for $1,284 by the Tyson Produce to the Live Stock National Bank of Sioux City, Iowa. When C. L. Fredericksen, president of appellee bank, was a witness he was asked why his bank paid this particular draft and on the same day turned down other checks of Tyson Produce. We quote:

"A. This particular check was written by Tyson to take care

of the bill of lading draft that he had received from us and had unloaded a car of cans that he was using to freeze eggs in and had received the draft much earlier in the day, but it was contained in this forty-four thousand dollar check; and he paid us for that merchandise earlier in the day. I'm not too sure that that check was signed at three thirty, now that I recall it. * * * Q. Well, will you explain to the court why this one draft was picked out and paid, and the drafts represented by Exhibits 'A' and 'C' were returned? A. Mr. Tyson returned the drafts and refused to pay them, that is the forty-four thousand dollars worth of drafts. Q. And weren't the drafts in question finally paid? A. No. * * * the delivery of the drafts and check were conditional transactions and there was no money in collected funds and the drafts deposited on April 1st were sent out for collection.''

This particular transaction involved the purchase and receipt of a car of cans being used by Tyson Produce in freezing eggs and as the bank had given the bill of lading to Tyson Produce it had no other course than to pay for said car of cans. It can also be inferred from the record that this car of cans was turned over to Tyson Produce before the Peter Fox drafts were found to be fraudulent.

Appellant likewise calls attention to a deposit made on April 1, 1946 by Tyson Produce to its account in appellee bank in the amount of $54,244.06. The record shows that this deposit was made up of uncollected items—drafts drawn on various purported consignees of merchandise in various parts of the United States. Like other items received from its correspondents they were entered in the various accounts of each by appellee subject to the right of appellee to charge back against such as were later uncollected. The record shows that something like $26,000 as represented by such items has not been paid and that some of such are in litigation. We find no merit to such claims.

VII. Did Tyson Produce have in appellee a valid account at the close of the business day on which the two disputed drafts were received? This seems to be one of the principal questions in the case.

In determining that question consideration must be given

to the contract between Tyson Produce and appellee. Also the custom and usage adopted and carried on as to various items sent in by correspondent banks. According to banking practices items received from such correspondent banks were at once run through the bank and conditional credit given the correspondent bank. A correspondent bank might send in numerous items, few of which might be drawn on the other correspondent. Some might be drawn on banks or other concerns far remote. However, the receiving bank would credit such items to the sending bank. Considerable time might elapse before the particular items made the rounds up to the point where final payment was made and credit given the initial payee. Necessarily many changes, such as charge-backs, might take place during such period.

In explaining the procedure which follows in such matters cashier A. W. Wies of the Pioneer Bank testified:

"The Live Stock Bank was the correspondent bank for Pioneer Savings Bank and handled all items forwarded for collection and credit, subject to return if uncollected in line with current banking practices in this area. * * * These instruments [letters of transmittal from Pioneer Bank to Live Stock Bank] are drawn that way and have at the top thereof, 'We enclose for collection and credit.' That is the form that was used between the Pioneer Valley Bank and the Live Stock National Bank on each day's business. * * * When these items [remittances from the Pioneer Bank] come in a conditional credit is put upon the daily statement for the amount. The only other way the banks could do it between themselves would be, when our remittance came, they would have to go in and check the remittances, and then reject them, if any, right then and there. If the conditional credit was not given for the full amount of the remittance made by us on all the items in it, then the Live Stock National Bank would have to check those items right at the time they came in, and notify us that certain ones they would not give credit for. Then our bank would have to be continually changing its books and the entries in those books. The Live Stock National Bank, as the correspondent bank with the Pioneer Valley Savings

Bank, collected for us all collection items that the Pioneer Valley Savings Bank had outside of Sergeant Bluff. In Exhibits 5 and 6 in addition to the two drafts drawn by Tyson Produce there were included items that practically had to go all over the country. * * * I have been engaged in the general banking business in this territory for a number of years—about 20 years—I am familiar with the common practice and custom and usage of banks in this territory. There is nothing unusual or out of the ordinary in the manner in which these accounts are handled between the Pioneer Valley Savings Bank and the Live Stock National Bank. The manner in which they were handled is the common and ordinary custom and practice in banking in this territory. Exhibits 5 and 6 included many items not on the Live Stock National Bank which they would have to collect in the ordinary course of business. Practically every remittance we made on that basis was of the same character. The Pioneer Valley Savings Bank is not a member of the Federal Reserve Bank. The Live Stock National Bank is. That was one of the reasons the Live Stock National Bank acted as our correspondent. Under the agreement contained in defendant's Exhibit 4 in addition to what I have said as to the ordinary and usual custom and practice and usage of banks, the credit the Live Stock National Bank gave the Pioneer Valley Savings Bank on the daily remittances, such as are shown by Exhibits 5 and 6, and those remittances themselves, are subject to the items being charged back, in the event they were not actually collected.''

This witness went on to say:

''Under the contract, Exhibit 4, and bank practice and custom and usage, it was the practice to give immediate credit for items sent, without examination, but the items themselves were, at the time, assumed to be collectible and then it was the practice to charge back any of those items if they were not collected. Heretofore the Pioneer Valley Savings Bank did that same thing on all items received from the Live Stock National Bank, and the Live Stock did the same thing with the Pioneer Valley. That same situation was true even as to any checks that might

be included in these daily remittances that were drawn on the Live Stock National Bank itself, and, conversely, on the Pioneer that might be sent by the Live Stock to us. Those checks were taken conditionally subject to being good at the close of the day's business."

Exhibits 5 and 6 referred to by witness Wies, cashier of the Pioneer Bank, were the transmittal slips of the Pioneer Bank on the dates of March 29th and 30th. The record shows that these two exhibits had listed thereon one hundred six separate and distinct items being sent to appellee bank and for which the Pioneer Bank was asking "collection and credit," not to the various payees of the items enclosed, but to the Pioneer Bank. It seems to us that as a matter of orderly bookkeeping and record the appellee could not have handled the items sent in any other manner. It had a right to be guided by its contract with the Pioneer Bank. The universal practice of permitting necessary and proper changes during the business day is of the highest importance in banking transactions.

It is the claim of appellee that it had an absolute right to charge back against the Tyson Produce general deposit account the fraudulent Peter Fox Sons Company drafts. These fraudulent drafts totaled $121,500 and after charging back $85,809 that general deposit was exhausted leaving in the hands of appellee about $35,000 in worthless drafts.

Appellant disputes this claimed right of charge-back under the record in this case. After all the transaction of the charge-back was between appellee bank and Tyson Produce. Between them there was a contract giving the bank that right. Appellant was not a party to it. He had returned to him the drafts and he was in no worse position than he was before. See Dille v. White, supra, 132 Iowa 327, 109 N. W. 909, 10 L. R. A., N. S., 510.

In the case of Andrew v. American Sav. Bk., 218 Iowa 489, 493, 255 N. W. 871, 873, this court said:

"It is the settled law of this state that a bank has a possessory lien against a depositor's general deposit account in the bank for any indebtedness owing the bank by the depositor."

The fraudulent Peter Fox deposits resulted in credits produced by fraud and would be a charge against Tyson Produce. In the case of Brown v. Sheldon State Bk., 139 Iowa 83, 89, 117 N. W. 289, 291, this court said:

"It is the rule in this state, as it is in many other jurisdictions, to allow setoff where parties are mutually indebted and one becomes insolvent. And it is not material that the indebtedness, sought to be canceled by offset, is not due at the time."

See cases there cited. Also Thomas v. Exchange Bank, 99 Iowa 202, 68 N. W. 780, 35 L. R. A. 379; Wikel v. Garrison, 82 Iowa 453, 48 N. W. 803; Smith v. Sanborn State Bk., 147 Iowa 640, 126 N. W. 779, 30 L. R. A., N. S., 517, 140 Am. St. Rep. 336; Cable v. Iowa State Sav. Bk., 197 Iowa 393, 194 N. W. 957, 197 N. W. 434, 31 A. L. R. 748.

While we do not regard the matter of the insolvency of Tyson Produce as material in this case, still the records show that such concern was insolvent at the time appellant's drafts were presented.

We think that the facts as appearing from the record bring them within the application of the above rules.

We hold that under the legal rules applicable, as well as under the agreements between appellee and the Tyson Produce, and in addition its contract with the Pioneer Bank, the appellee acted within its rights in taking the offset and returning the two drafts.

Appellant urged as further error the refusal of the trial court to amend its findings of fact. This motion sets forth various alleged facts which appellant claimed would have entitled him to a verdict. These claimed facts are various conclusions which the appellant draws from the record evidence. We think that the findings of fact by the court fully justify its later conclusions of law as above set forth.

In this connection appellant argues that the pleaded answer does not justify the finding of the court. The record does not show that the appellant made any objection to the alleged defect in pleading until the motion made following the

court's ruling. During the trial appellee introduced evidence to show the fraudulent device by the Tyson Produce whereby the false Peter Fox drafts were used to build up a fictitious credit in Tyson Produce. Appellant made no objection to this line of testimony. These fraudulent drafts were identified and received in record without objection—likewise, the appellee's bank statement showing book entries of such fraudulent credits. As a matter of fact the bank statements were offered in evidence by the appellant. While the matter of the Peter Fox drafts was not specifically pleaded by appellee in its answer, yet its denial of funds on hand with which appellant's drafts could be paid at least indirectly created such an issue. The record shows that such issue was litigated. The appellant was relying for payment upon a credit of Tyson Produce with appellee bank, which the record shows was built up by the false Peter Fox credits. We see no merit in such claim.

We have considered the other matters raised in appellant's brief. We hold that under the present record they are without merit.

The decision of the trial court was correct and the case is affirmed.—Affirmed.

OLIVER, C. J., and BLISS, HALE, GARFIELD, SMITH, MULRONEY, and HAYS, JJ., concur.