THE FIRST NATIONAL BANK OF MEDICINE LODGE V. E. B. PECK, *as County Treasurer of Barber County.*

BANK — *Deposit of Public Money — County Board — No Authority.* No authority is given by chapter 189 of the Laws of 1889, to the board of county commissioners to designate a bank or banks for the deposit of the public moneys for a definite period of time; nor can the board make any order, or make any contract with the depository that will prevent the designation of a different depository whenever the board in its discretion determines that the public interest will be best subserved by such a change.

## Original Proceeding in Mandamus.

PETITION filed in this court on February 15, 1890. The facts are sufficiently set forth in the opinion, filed on May 10, 1890.

*Sluss & Stanley, Mansfield, Eaton & Pollock, E. Sample,* and *Chester I. Long,* for plaintiff.

*R. A. Cameron,* county attorney, for defendant; *A. J. Jones,* of counsel.

The opinion of the court was delivered by

JOHNSTON, J.: In the alternative writ of *mandamus* heretofore allowed, it is stated that on November 10, 1888, the board of county commissioners of Barber county, Kansas, designated the First National Bank of Medicine Lodge as the bank in which to deposit the public moneys of Barber county, and required the bank to execute a bond in the sum of $100,000, and also to pay two per cent. per annum on the average daily balances of the deposit, and to credit the same monthly to the account of the county treasurer. This bond was executed by the bank and accepted by the county board; and the county treasurer thereafter, in compliance with the order, deposited the public moneys with the plaintiff, and the bank paid interest on the average daily balances, as required by the designation, until the 1st day of January, 1890. On the 8th day of November, 1889, the board of county commis-

sioners entered an order designating the bank as the place of deposit for all public moneys for a period of three years next succeeding January 1, 1890, and the bank was required to give a bond in the sum of $100,000, and to pay two per cent. per annum on the average daily balances of the deposit. The bond was executed in behalf of the bank on the same day, which was approved by the county board, and it is alleged that from the 1st day of January, 1890, until the 13th day of February, 1890, the bank continued to allow interest on the deposit made by the county treasurer at the rate of two per cent. per annum. On the 15th day of January, 1890, an order was made by the board of county commissioners, directing the county treasurer to immediately withdraw from the First National Bank all the moneys in the bank belonging to the county, and place the same in the vault in the office of the county treasurer until the further order of the board. Afterward, on February 13, 1890, the board of county commissioners, at an adjourned meeting, designated the Citizens' National Bank of Medicine Lodge as the depository of public moneys, and required that the bank give a bond in the sum of $125,000, and to pay five per cent. per annum on the average daily deposits; and directed the county treasurer to withdraw all the public funds from the First National Bank and deposit the same in the Citizens' National Bank. This designation was to remain in force only until the further order of the county commissioners. In pursuance of this order, the county treasurer demanded from the First National Bank the funds in its possession, with a view of depositing them in the Citizens' National Bank, and $10,000 of the public moneys were given to the county treasurer, under protest, in obedience to his demand; and the county treasurer is insisting on the balance of the moneys in the hands of the plaintiff, for the purpose of placing the same on deposit with the other bank. The county treasurer has ceased, and now refuses, to deposit the public moneys of the county of Barber with the plaintiff, and this proceeding is brought to compel him to deposit all public moneys that may come into his hands as

treasurer of the county, or that are now in his hands, with the plaintiff, and also to withdraw from the Citizens' National Bank all moneys which he deposited there as treasurer of the county, and place the same on deposit with the plaintiff, in compliance with the order of November 8, 1889. It is further stated in the writ that the bank is solvent, has executed a sufficient bond, and that no reason exists for believing that the bank is not a proper and safe depository for the public funds of the county.

The defendant moves to quash the alternative writ on the ground that the facts stated are insufficient to constitute either a cause of action, or ground of relief, in favor of the plaintiff. Several questions are raised and discussed on this motion, but the real point in controversy between the parties, and the only one that we need to consider, is, whether it was within the power of the board of county commissioners to make the order of November 8, 1889, designating the plaintiff bank as the depository of public moneys for a fixed period of three years, and thus prevent the county board, as then constituted, or as it may be reorganized from year to year, from designating other and different banks as the safety of the public moneys may seem to require. The election of 1889 changed the membership of the county board. As soon as the result of this election was ascertained, two members of the county board, who were about to pass out of office, undertook to bind the county and their successors to hold the public funds in the First National Bank for a period of three years. That bank was already the public depository, and by the terms of the first designation, was to continue as such until the order was revoked; yet the county commissioners, who were going out of office in a few days, made a new order and designation; but neither the amount of the bond to be given nor the interest required to be paid to the county on the deposits was changed. The purpose of these retiring commissioners in making the second order is easily seen. Passing over the questions as to the form of the action and other technical matters discussed, we will consider whether the retiring commissioners

effected their purpose, and tied the hands of their successors, by the order of November 8, 1889. The only statute authorizing the board to designate a bank for the deposit of the funds of Barber county, is found in chapter 189 of the Laws of 1889, which provides:

"That in all counties having a population of less than twenty-five thousand inhabitants, the county treasurer shall deposit daily all public money in some responsible bank or banks, located at the county seat, to be designated by the board of county commissioners, in the name of said treasurer as such officer, which bank shall pay such interest on average daily balances as may be agreed upon by the board of county commissioners; and such bank or banks shall credit the same monthly to the account of said treasurer; and before making such deposits, the said board shall take from such bank or banks a good and sufficient bond in a sum double the largest approximate amount that may be on deposit at any one time, conditioned that such deposits shall be promptly paid on the check or draft of the treasurer of said county; and such bank or banks shall, on the first Monday of each month, file with the county clerk a statement of the amount of money on hand at the close of business each day during the previous month, and the amount of interest accrued thereon to said date."

Assuming that the statute is valid and compulsory, no questions of that kind being raised, we still think that it does not warrant the action that was taken. It is true, as contended by the plaintiff, that the board is a continuing body, and that any contract made by it with authority is inviolable and binding upon the county; but we are of opinion that in this case the board exceeded its power. No express authority is found in the statute giving the county commissioners authority to designate a bank for any definite period of time, and they have only such powers in that respect as are given them by statute. The legislature does not require that the board shall ask for bids, nor that it shall designate the bank offering the highest rate of interest. The conditions imposed by the statute are that only responsible banks shall be designated, and that good and sufficient bonds shall be required. No limits as to the rate of interest nor as to the number of banks which a board

may designate are prescribed. There is no provision that the board shall negotiate or enter into a contract of any kind with banks. It simply is required to exercise its judgment and discretion in the selection of one or more banks, and instead of negotiating with or receiving bids from them as to rates of interest, the statute expressly provides that such rate shall be paid as may be agreed or determined upon by the board. The county commissioners determine the rate of interest to be paid, the bond to be given, and then make the designation. If the bank designated refuses to accept the funds upon the required conditions, another designation is to be made, and if it accepts, the bond is given, the funds deposited, and interest is paid on the average daily balance of deposits for such length of time as the county board may keep the account or public funds in the bank. If it had been the purpose of the legislature that county commissioners might tie their hands and those of their successors and bind the county to retain the funds in a certain bank through several changes in the membership of the board, or for any stated time, it would surely have made it clear in the statute enacted. The public interest will be best subserved by leaving the board free to change the depository whenever in the judgment of the commissioners the safety of the public moneys and the good of the county require such change. If the other policy was pursued, and an unsound depository should deny its unsoundness and refuse to surrender the funds, it would be necessary for the county to enter into a litigation with the bank to show that it was insecure and irresponsible; and meantime the interests of the county might be still further imperiled and possibly sacrificed. Even if the bond given by the bank were ever so good, yet the funds would be tied up during the controversy and until an action on the bond was successfully prosecuted to judgment. If the controversy should be long continued the security might become greatly impaired and the public suffer a heavy loss. Whatever might be the result, the litigation and the locking-up of the public funds would seriously embarrass the public business. All of these objections and risks were evidently

foreseen by the legislature, and hence in providing for a deposit of the public funds no power was given to the board to designate a depository or to surrender the control of the public funds for a definite period of time. If the board might tie its hands and bind the county in this respect for one year or three years, why might it not under like circumstances extend the period to six, eight, or even ten years? This would be injurious to the public interest and therefore contrary to public policy, and in the absence of express legislative sanction, no such purpose should be inferred. The prime consideration is the safety of the public funds, and the manifest purpose of the law-makers was that the board should be wholly free to change the depository whenever it had reason to believe that the public interest would be best subserved by such a course. It follows that the peremptory writ of *mandamus* must be denied.

All the Justices concurring.