## McNULTA v. WEST CHICAGO PARK COM'RS.

## WEST CHICAGO PARK COM'RS v. McNULTA.

(Circuit Court of Appeals, Seventh Circuit. March 2, 1900.)

Nos. 580, 603.

1. BANKS—DEPOSIT OF PUBLIC FUNDS—LIABILITY FOR MISAPPROPRIATION BY OFFICER.

A private banking firm transacted practically its entire business through a national bank. It cleared through such bank, and kept an account therein, in which it deposited all checks and cash items received, and against which checks drawn upon it and coming through the clearing house were charged. At a time when the firm was largely indebted to the bank, and known by the bank officers to be insolvent, one of the partners was appointed treasurer of a city park board, the president of the bank becoming surety on his bond. A portion of the park funds was at once used in paying a large overdraft of the firm in its bank account, the remainder being for a time carried in a separate account in the bank to the credit of the treasurer, but from which he from time to time checked amounts in payment of further overdrafts of the firm. Subsequently the entire account was transferred and merged in that of the firm, the treasurer from that time nominally making the private firm his depositary, and the firm depositing the park funds in its own bank account, as was known by the bank officers. Both the bank and the firm suspended through insolvency. *Held*, that the bank was a party to the misappropriation of the park funds by the treasurer, and was liable for the amount so misappropriated, and of which it received to some extent the benefit.

2. SAME—SUIT TO RECOVER—PLEADING.

Under a bill filed by the park board against the bank, evidence of the insolvency of the firm of which the treasurer was a member at the time the park funds were appropriated to its use, and that such fact was known to defendant, was competent in support of the charge of misappropriation, although not directly alleged.

3. APPEAL—ASSIGNMENT OF ERRORS.

An assignment of errors that the court erred in finding the defendant indebted in the sum it did, or any other sum, is not sufficient to present the question whether the inclusion of an item of interest was erroneous.

**4. BANKS—INSOLVENCY—CLAIM OF PREFERENCE.**
    A deposit of public funds on which, under the law, interest must be
    paid, cannot be special or in trust, and, in case of insolvency of the de-
    positary, stands on the same footing with other deposits.

Appeal from the Circuit Court of the United States for the North-
ern Division of the Northern District of Illinois.

Thomas A. Moran and John P. Wilson, for appellant.
John S. Miller, E. O. Brown, and Francis Riddle, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BAKER, Dis-
trict Judge.

WOODS, Circuit Judge. These appeals are from a decree by
which the West Chicago Park Commissioners, a quasi municipal
corporation, was adjudged entitled to recover of the National Bank
of Illinois, at Chicago, the sum of $316,013.40, and the receiver of the
bank was directed to pay the complainant as a creditor for that
amount ratably with other creditors of the bank. The receiver, who
is the principal appellant, challenges the liability of the bank. The
contention on the cross appeal is that the sum due the park commis-
sioners should have been declared a preferred claim. The theory
of the bill, in brief, is that Edward S. Dreyer, who was the senior
member of the banking firm of E. S. Dreyer & Co., and from March 13,
1894, until December 21, 1896, was the treasurer of the West Chicago
Park Commissioners, misapplied the moneys of that body to the dis-
charge of the liabilities of E. S. Dreyer & Co. to the National Bank of
Illinois, at Chicago; the officers of the bank participating in the
wrong.

The facts and circumstances in evidence are set out in great detail
in the report of the special master, but only a summary statement
here is deemed necessary. E. S. Dreyer & Co. was a partnership,
composed of Edward S. Dreyer and Robert Berger, a son-in-law of
George Schneider, who from August, 1871, to the end, in December,
1896, was the president of the National Bank of Illinois. The busi-
ness of the partnership, commencing about 1879, was at first con-
fined to dealings in real estate and mortgage loans, but later was
extended to private banking. This was done at the instance of
Schneider, the president, and W. A. Hammond, the second vice presi-
dent, of the National Bank of Illinois, who promised that the bank
would see the firm "through." The subsequent transactions of the
bank which have been brought into question in this suit seem to
have been efforts to make good that promise. The firm was not a
member of the Chicago Clearing House, but "cleared" through the
National Bank of Illinois. It is substantially true, as stated in the
brief for the appellant, that, from the inception of the business until
the failure of the bank, the firm kept a deposit account in the bank,
"to the credit of which were placed all checks deposited with E. S.
Dreyer & Co., and all moneys received by them and paid out over
their counter, and to which account all checks upon E. S. Dreyer &
Co. coming through the clearing house were charged, and also all
cash paid by said bank to the firm of E. S. Dreyer & Co. This method

of doing business continued through the entire period covered by E. S. Dreyer's treasurership of the West Chicago Park Commissioners. For a short time after his appointment as treasurer, Dreyer kept an account in the National Bank of Illinois as treasurer of the West Chicago Park Commissioners. The last deposit to the credit of this account was made in November, 1894. On April 29, 1895, there stood to the credit of this account only the sum of $908.20, which was subsequently transferred to the credit of the account of E. S. Dreyer & Co. in the National Bank of Illinois. After November, 1894, all park funds coming into Dreyer's hands were deposited by him to his credit as treasurer with E. S. Dreyer & Co., and were deposited by said firm to their credit with the National Bank of Illinois, the same as all other checks and deposits received by them as bankers, and all warrants drawn on E. S. Dreyer as treasurer were paid by E. S. Dreyer & Co. through the National Bank of Illinois precisely the same as all other checks drawn on them by their depositors."

But while, as an outline of the method of business pursued, this statement is not especially objectionable, its full significance will be more evident when it is added that at the time of Dreyer's appointment as treasurer of the West Chicago Park Commissioners, E. S. Dreyer & Co., though possessed of large interests in real estate, were practically insolvent, and without the aid of the National Bank of Illinois would have been forced to suspend. The bank held their obligations for large amounts, and, besides, their deposit account almost constantly was heavily overdrawn. In this situation Schneider, the president of the bank, became surety upon Dreyer's first official bond, and upon each successive bond required upon his reappointment at the end of each year. Dreyer's first deposit was $249,024.75, made on April 13, 1894, to the credit of E. S. Dreyer & Co.'s account, which was then overdrawn to the amount of $49,054.06. On the next day E. S. Dreyer & Co. drew against their account so replenished a check in favor of E. S. Dreyer, treasurer, for $199,024, which was deposited in the bank to the credit of Dreyer as treasurer, and was the beginning of the account kept as before stated. This was done upon an understanding with the officers of the bank that the account should be so opened, and that, of the money coming into Dreyer's hands as treasurer, E. S. Dreyer & Co. should be allowed to use in their business $50,000 (extinguishing the existing overdraft), and that all other park money should be deposited in Dreyer's account as treasurer, and should be drawn out only on checks approved by Carl Moll, the cashier of the bank; and so the business was done while that account was kept open, and large sums were checked therefrom and transferred to the credit of E. S. Dreyer & Co. for the purpose of paying further overdrafts in their account. But this method of operation was so palpably awkward—each transaction carrying on its face the proof of a misappropriation of public money to private use—that it was necessarily abandoned. The change, however, was one of bookkeeping, more than of essential fact. It was so arranged that all park funds went directly to the credit of E. S. Dreyer & Co. in the bank, constantly augmenting their deposit, or diminishing their overdraft, instead of being transferred from time to time for the purpose

of reducing overdrafts; but the bank officers, the proof is convincing, all the time knew whence the money came, and were no less responsible than before for the misapplication. Accounts were kept by E. S. Dreyer & Co. from the beginning, charging themselves and crediting the West Chicago Park Commissioners with all park funds which came to Dreyer's hands as treasurer; but that was bookkeeping merely. At first the funds went actually into the National Bank to the credit of Dreyer's account as treasurer, and, after that account was closed, into the account of E. S. Dreyer & Co. in that bank. The misapplication of the money, whether by one mode of bookkeeping or the other, was essentially the same, and necessarily was so understood by all concerned. Only as a matter of book entries was it true, as quoted from the brief, that "all park funds coming into Dreyer's hands were deposited by him to his credit with E. S. Dreyer & Co., and were deposited by said firm to their credit with the National Bank of Illinois," etc.; and if it be true, as stated, that "all other checks and deposits received by them as bankers" were treated in the same way, it only emphasizes the conclusion of the court below that in legal effect "the defendant bank absorbed the banking house of E. S. Dreyer & Co., and thereby became, as to the complainant and its treasurer, the direct depositary of complainant's money." Among the items of the account were the proceeds of bonds of the West Chicago Park Commissioners to the amount of $600,000 face value, which in May or June, 1896, came to the hands of Dreyer for sale. The sales were effected by the National Bank, and the proceeds received by it and placed directly to the credit of Dreyer & Co., on whose books entries of the transaction were not made until the next day after receipt by the National Bank, and neither the bonds nor proceeds were ever in the actual possession of Dreyer & Co. The same is true of other items of the account.

We do not dissent from the proposition of counsel for the appellant, in their original brief, that:

"In order to render the National Bank of Illinois liable to the park commissioners, it must appear either that the bank received some benefit from the misappropriation of the park funds by Dreyer, or else that the bank was guilty of such participation in the misappropriation of said funds as to render it liable, even although it received no benefit therefrom."

This concedes the misappropriation. The fact was undeniable; and it is apparent, on the facts already stated, both that the bank received benefit from, and actually and knowingly participated in, the misappropriation. The charge that the officers of the bank induced the deposit of the park funds in the bank to the credit of E. S. Dreyer & Co. for the purpose of thereby reducing the indebtedness of that firm to the bank, it is urged, cannot be true, because that indebtedness greatly increased during the period of Dreyer's treasurership. The fallacy of this is plain. Each misappropriation, when made, operated to reduce the amount of the existing indebtedness. So Dreyer and the officers of the bank well understood and presumably intended. Each deposit made lighter the constantly growing burden of keeping the promise to see Dreyer & Berger through their embarrassments.

Equally unavailing is the argument that the insolvency of E. S. Dreyer & Co. was not alleged in the bill, and was not known to the officers of the bank; that they did not anticipate loss to the park commissioners by reason of the use made by Dreyer of the park funds; and that the loss arose from the unforeseen and unexpected insolvency of the bank itself, which theretofore "had honored all the checks of E. S. Dreyer & Co." While the bill contains no direct averment of the insolvency, proof on the subject was pertinent to the charge of misappropriation of the park funds by Dreyer and the bank. That the officers of the bank were fully cognizant of the embarrassed condition of Dreyer & Co., and consciously participated in the purpose, if they did not require, that the funds be appropriated as they were for the mutual benefit of Dreyer & Co. and the bank, the evidence leaves no room to doubt; and responsibility cannot be escaped on the ground that the insolvency of the bank and its inability to pay the demands of the park commissioners from time to time when called for by the checks of E. S. Dreyer & Co. was an unforeseen and unexpected event. It was the known inability of Dreyer & Co. to meet their liabilities which constituted the evident impropriety and wrong of turning over the park funds to their use; and it was participation in the misappropriation so effected that made the bank liable. The subsequent inability of the bank to meet the checks of Dreyer & Co. in favor of the park commissioners, as it had been accustomed and doubtless intended to continue to do, has no relation to the question. The bank confessedly was carrying Dreyer & Co., knowing their present inability to meet the demands of their depositors, so called, in the usual course of business from day to day; and even if, as contended, they believed that, by reason of the hoped-for advance in the values of real estate, Dreyer & Co. would become solvent, the wrong involved in applying the park funds to the present discharge of the obligations of the helpless debtor to itself was none the less obvious and inexcusable. The risk it was constantly and voluntarily assuming in the attempt to carry Dreyer & Co. it had no right to shift upon the park commissioners or others who had deposited with them, presumably in the belief that they were an independent, self-controlled, and responsible concern. If it be true that the park officers knew that their funds were being deposited with Dreyer & Co., it is of no significance, because they had no power or right to interfere; and it does not appear that they had any reason to suspect the insolvency or embarrassed condition of the firm. The rules of the park board required that park funds be deposited in the name of the park board; but the treasurer alone determined the place of deposit. Indeed, by the act of July 1, 1893 (Laws Ill. 1893, p. 136), he was required "at the end of each year to account for interest on the daily balances of the funds from time to time in his custody, at a rate of not less than two per cent. per annum, and as much higher as solvent banks that are reasonably accessible pay on daily balances of accounts that are subject to sight draft or check." This statute, it was held in Dreyer v. People, 176 Ill. 590, 52 N. E. 372, did not affect the fiduciary or public character of funds, by converting the officer who had the custody thereof into an owner, responsible only as a debtor

for the repayment of them. The accruing interest, under the statute, becomes a part of the fund to be accounted for. The bank which receives the deposit, promising to pay interest on daily balances, of course may treat the money as an ordinary deposit, allowing it to be checked out by the depositor for any proper public use. Dreyer's first account with the bank, instead of being in his own name as treasurer, should have been in the name of the park board; but the difference was perhaps not material. In one form or the other, its character would have been sufficiently indicated, and so long as checks against it were honored only when drawn by Dreyer as treasurer, and apparently for a proper public use,—and perhaps when they were not known by the bank to be for an improper use,—the bank clearly was not responsible for a resulting misappropriation of the fund; but when knowingly, and for its own advantage, it permitted and participated in a diversion of the fund to the discharge of the liabilities of an insolvent or embarrassed debtor to itself, it ought in good conscience to make restitution, and the decree to that effect is not erroneous.

The contention that the amount of the recovery is too large by reason of interest with which Dreyer & Co. charged themselves from month to month, under the statute, does not arise upon the assignment of errors. The second, third, and fifth specifications of error are to the effect that the court erred in finding the bank indebted to the complainant in the sum of $316,013.40, or any other sum, but there is in no specification a suggestion of the particular error now insisted upon. See Stewart v. Morris, 37 C. C. A. 562, 96 Fed. 703; Columbus Construction Co. v. Crane Co. (C. C. A.; Jan. Sess. 1900). 98 Fed. 946.

The cross appeal is without merit. A deposit upon which interest must be paid cannot be special or in trust, and, in case of the failure of the bank, must, for the purpose of payment, be on the same footing with other deposits or unsecured demands.

The decree below is affirmed.