PALO ALTO COUNTY, Appellant, v. BERNARD ULRICH, Receiver, Appellee; IOWA BONDING & CASUALTY COMPANY, Appellant.

BANKS AND BANKING: Insolvency—Preferences—State Statute Inapplicable. A Federal statute which provides that, in the settlement of the affairs of a national bank, the assets shall be ratably distributed among the creditors, necessarily excludes a state statute which provides for a preference in favor of public funds.

COUNTIES: Deposit of Funds—Approval of Depository—Continuing Authority. The approval by the board of supervisors, by proper resolution and record, of a bank as a proper depository of county funds, constitutes a *continuing* authority to the county treasurer to deposit such funds in said depository (the statute being otherwise complied with) until such authority is expressly or impliedly withdrawn by the same or by a future board. (Sec. 7404, Code of 1924.)

BANKS AND BANKING: Deposits—Ownership of Deposited Draft. A bank which receives a draft indorsed to itself, and credits the

depositor with the full amount thereof as cash, and expressly or impliedly recognizes a right in the depositor to draw at once on said credit, and otherwise treats the deposit *as its own*, must, in the absence of any other inconsistent state of facts, be deemed the absolute owner of the draft; and this is true even though the bank reserved the right to "charge back" the amount of the credit if the draft should not be paid, and even though the depositor, as a favor to the bank, did not at once draw on the said credit.

**BANKS AND BANKING:** Deposits—Owner (?) or Collector (?) of
4 **Deposited Draft.** Concede, arguendo, that a bank, in receiving a duly indorsed draft from a depositor, and in crediting the depositor's account accordingly, becomes simply a *collector*, with no title to the draft or to the proceeds thereof, yet such bank does become the *debtor* of the depositor the moment the bank receives an irrevocable credit on the books of its correspondent bank as the result of the actual collection of the draft.

**BANKS AND BANKING:** Insolvency—Fraud as Basis for Preference.
5 Principle recognized that the fraud out of which a trust will arise entitling a depositor to a preference in the distribution of the assets of an insolvent bank, calls for proof of the insolvency of the bank and of the express or necessarily implied knowledge thereof by the officers.

Headnote 1. 7 C. J. p. 848. Headnote 2. 15 C. J. p. 448; 18 C. J. pp. 583, 592. Headnote 3. 7 C. J. pp. 603, 605. Headnote 4. 7 C. J. p. 616. Headnote 5. 7 C. J. p. 730.

*Appeal from Palo Alto District Court.*—N. J. LEE, Judge.

DECEMBER 11, 1924.

A bonding company, surety upon a depository bond of a national bank, on the failure of the bank paid to the county, the obligee in the bond, the amount of its liability thereon, and in the name of the county, and for itself by assignment from the county and by right of subrogation, claimed a preference for the amount so paid, in the distribution of the assets of the bank. From a decree denying a preference, the bonding company and the county appeal.—*Affirmed.*

*Miller, Kelly, Shuttleworth & McManus* and *Heald, Cook & Heald,* for appellant Palo Alto County.

*J. R. McManus,* for appellant Iowa Bonding & Casualty Company.

*Marling & Morling* and *Davidson & Burt,* for appellee.

VERMILION, J.—It appears without dispute that, on February 4, 1919, the board of supervisors of Palo Alto County passed the following resolution:

"Now, to wit, on this 4th day of February, 1919, the same being the regular day of the regular adjourned January session of the board of supervisors of Palo Alto County, Iowa, and matters pertaining to depositing of money in the hands of the county treasurer in banks, as per the amount of their bonds and as provided by Section 1457 of the Code and laws amendatory thereto, having come on for hearing, and it appearing to the board that sums not to exceed the amounts hereinafter shown be deposited in banks having filed a sufficient bond duly approved by said board and county treasurer."

There followed a list of banks and amounts, which included "Emmetsburg National Bank, Emmetsburg, Iowa, $50,000."

Thereafter, in each of the years 1919 and 1920, the Emmetsburg National Bank furnished to the county treasurer a depository bond in the sum of $100,000, with the appellant bonding company as surety, and received deposits of county funds. In December of 1920, the bank and the bonding company had correspondence in reference to a like bond, to be given in 1921. At the suggestion of the bonding company, and upon a consideration of the amount of such funds on deposit with the bank during the year preceding, the bank, on December 27, 1920, executed a depository bond in the sum of $50,000, with the bonding company as surety. This bond was presented to and approved by the county treasurer and the board of supervisors, as shown by the bond itself; the approval of the board being further shown by the minutes of its proceedings under date of January 4, 1921, as follows: "The following deposit bonds of the banks hereinafter stated were on motion approved, * * * Emmetsburg National Bank." The county treasurer continued thereafter to deposit county funds in the bank. On the morning of March 2, 1921, the bank closed its doors, and subsequently

it was put in the hands of a receiver by the comptroller of the currency. At the time the bank so suspended business, it had on deposit, as shown by its books, after some corrections of no importance here, $46,558.27 of county funds. Thereafter, on demand of the county treasurer, the bonding company paid to the treasurer $45,454.54, the maximum amount for which it could be liable upon its bond of $50,000, under the statute providing that the depository bond should be ten per cent more than the amount deposited (Section 1457, Code Supplement, 1913, Section 7405, Code of 1924), and took an assignment from the county of its claim against the bank, including all rights of preference which the county or its treasurer might have against the bank or its receiver. The assignment authorized the bonding company to proceed in the name of the county, and thereafter a claim was so filed against the receiver for $46,558.27, and this action was begun. The bonding company was required to interplead in the case in its own behalf, which it did, adopting the allegations of the petition. The claim was allowed as a preferred claim in the amount of $1,103.73, the difference between the amount of county funds in the bank at the time it stopped business, and the amount paid by the bonding company; and the sum of $45,454.54 was allowed as an unpreferred claim.

Appellants' complaint in this court is of the action of the court below in denying a preference for the claim for $45,454.54, the amount paid by the bonding company in settlement of the obligation of its bond. The chief contention, broadly stated, is that the county funds, or a part thereof, constituted a trust fund in the hands of the bank and its receiver, for which the county was entitled to a preference, and which the bonding company, by reason of its payment to the county, may enforce, as against the funds in the hands of the receiver, under the assignment from the county, and by virtue of the doctrine of subrogation. The claim that the fund in the bank constituted a trust fund is based upon several propositions, which will be considered in order.

I. We first advert, however, to a proposition advanced in argument, that the county was entitled to a preference under Section 3825-a, Code Supplement, 1913 (Section 12719, Code

1. BANKS AND BANKING: insolvency: preferences: state statute inapplicable. of 1924), as construed by this court in *Buena Vista County v. Marathon Sav. Bank,* 198 Iowa 692. In that case, we held, in the receivership of a state bank, and under the plain and unequivocal language of the statute, to the effect that, where the property of any corporation has been placed in the hands of a receiver for distribution, after the payment of costs and taxes, or other debts entitled to a preference under the laws of the United States, debts due the state, county, or other municipal corporation in this state should be entitled to priority of payment, that a county was entitled to a preference for the amount of its funds on deposit in the bank. We said:

"Having determined that there is a debt, and that it is due a municipal corporation, we are bound to place it in the class which the legislature has declared shall be entitled to preference."

And again:

"We perceive no valid reason for holding that a bank of the character of appellant is not within the general law."

We further said:

"The Federal law governing insolvent national banks and the interpretation thereof by the Supreme Court of the United States cannot be of aid in the solution of the problem before us."

The distribution of the assets of an insolvent national bank is governed by Federal statute, Section 5236, Revised Statutes; and this has been held not only to defeat a claim of preference on behalf of the United States, under a Federal statute giving priority to debts due the Federal government, as noted in the *Marathon Sav. Bank* case, but also to prevail, where the assets of a national bank are to be distributed, over a state statute giving a preference to a particular class of depositors in the distribution of the assets of an insolvent bank. *Davis v. Elmira Sav. Bank,* 161 U. S. 275 (40 L. Ed. 700). See, also, *Easton v. Iowa,* 188 U. S. 220 (47 L. Ed. 452). In the winding up of national banks by the Federal authorities, the state law cannot displace the Federal statute providing for a ratable distribution among creditors. *First Nat. Bank v. Selden,* 120 Fed. 212 (62 L. R. A. 559). Section 3825-a is ineffectual to give to the county a preference in the distribution of the assets of a national bank.

II.  Proceeding to a consideration of the claim that the money of the county on deposit with the bank constituted a trust fund, and that, for that reason, the preference should have been allowed, the first contention is that the bank was not designated as a depository of county funds, and that the deposit was therefore wrongful, and that, the fund having been traced into the hands of the receiver, it should be found that it was not a part of the assets of the bank, but was held in trust for the county.  Section 1457, above referred to, after providing that a county treasurer shall be liable to a fine for loaning or in any manner using for private purposes, state, county, or other funds in his hands, further provides that:

2. COUNTIES: deposit of funds: approval of depository: continuing authority.

"The county treasurer shall, with the approval of the board of supervisors as to place of deposit, by a resolution entered of record, deposit such funds in any bank or banks in the state to an amount fixed by such resolution at interest at the rate of at least two per cent per annum on ninety per cent of the daily balances payable at the end of each month all of which shall accrue to the benefit of the general county fund; but before such deposit is made, such bank shall file a bond with sureties to be approved by the treasurer and the board of supervisors in double the amount to be deposited, conditioned to hold the treasurer harmless from all loss by reason of such deposit or deposits; provided that in cases where an approved surety company's bond is furnished, said bond may be accepted in an amount equal to ten per cent more than the amount deposited."

The requirement of the statute is that the county treasurer shall, with the approval of the board of supervisors as to the place of deposit, by resolution entered of record, deposit the funds in his hands in any bank or banks in the state, to an amount fixed by the resolution; but that, before doing so, the bank must give a bond, if of an approved surety company, equal to an amount ten per cent greater than the amount deposited.

It cannot be doubted that the resolution of February 4, 1919, above set out, was a proper approval of the Emmetsburg National Bank as a place of deposit of county funds.  The in-

quiry here is narrowed to the question as to the length of time
for which such an approval or designation of a depository will
constitute authority for the county treasurer to deposit county
funds in the designated bank. It is the contention of the ap-
pellants that the board of supervisors had no authority to desig-
nate or approve a depository of county funds for a longer period
than the tenure of office of the members of the board. The stat-
ute does not so provide: it is silent on the subject of the length
of time for which such approval is effective. It does not itself
fix or limit the time for which such approval shall be made, or
during which county funds shall be deposited in the designated
bank; nor does it require the board to place any limit upon the
time during which its approval of a depository shall be author-
ity for the treasurer to make deposits therein. It does not re-
quire the approval of the board to be made at any particular
or stated time or meeting of the board, from which it might be
argued that a given approval of a depository would be authorita-
tive only until a recurrence of such meeting or time; although,
as will be seen, such a statutory provision has been held not to
warrant that implication. While the board of supervisors is a
continuous body, it is no doubt true that, as constituted at a
given time, it could not, by a present designation and approval
of a depository bond, bind the board as thereafter constituted.
*State v. Platner*, 43 Iowa 140. It may well be doubted if it
could bind itself by an approval that by its terms was irrevo-
cable for any definite time. But it is, we think, plain that, the
board of supervisors having designated and approved a bank as
a depository of county funds, such approval is effective, and
constitutes authority for the deposit therein of county funds
by the treasurer, where provisions of the statute with respect to
the bond of the depository have been complied with, until it is
revoked or a new depository is approved. As has been pointed
out, the statute contains nothing inconsistent with this view.
No considerations of public policy requiring a contrary holding
suggest themselves. We are not to be understood as saying that
a newly constituted board of supervisors has not the right to
expressly revoke an approval previously made, or to impliedly
do so by its approval of another depository, or that the board
may not do so on the assumption of office by a new treasurer, or,

indeed, that the board composed of the same members, and during the same term of office, may not so revoke an approval previously given. All that the present situation requires is the determination of the question whether a proper approval of a depository, in the absence of any limitation imposed by statute or in the resolution of approval, nevertheless expires at the end of the term of office of the individuals constituting the board of supervisors at the time it was given, or at the expiration of the term of the then county treasurer; or whether it constitutes a continuing authority for the treasurer, when the other provisions of the statute are complied with, to make deposit of county funds therein, until it is revoked or a new depository approved. Our conclusion that it does constitute such authority until so expressly or impliedly revoked, has abundant support in authority.

In *City Sav. Bank v. Wayne County Treasurer,* 84 Mich. 391 (47 N. W. 690), it was held that, although it was the duty of the newly elected county treasurer and board of auditors without unnecessary delay to designate one or more depositories, a designation by a prior treasurer and the board was valid until a new depository was designated by the new treasurer and board.

There were involved in the case of *First Nat. Bank v. Peck,* 43 Kan. 643 (23 Pac. 1077), the right of the board of county commissioners to designate a depository for a definite time, and its right to designate a different depository whenever it determined, in its discretion, that the public interests required. The statute under consideration was, in effect, very like ours. Any right to designate a depository for a definite period was denied by the court, and the power to revoke a prior designation was affirmed. In the course of its opinion, the court said:

"If the bank designated refuses to accept the funds upon the required conditions, another designation is to be made; and if it accepts, the bond is given, the funds deposited, and interest is paid on the average daily balance of deposit for such length of time as the county board may keep. the account or public funds in the bank."

In *Snattinger v. City,* 80 Kan. 341 (102 Pac. 508), it is said:

"The statute authorizing the designation of a depository does not undertake to prescribe how long the bank shall act as depository, nor did the ordinance or bond purport to fix the duration of the contract relation. The act, as well as the bond, proceeds upon the theory that the duration of the contract shall continue as long as deposits are made and received. In the absence of a provision authorizing the mayor and council to designate a bank as a depository of city funds for a definite period of time, a designation will be effectual so long as the city may place its funds in the bank."

In *National Sur. Co. v. Campbell,* 108 Wash. 596 (185 Pac. 602), in construing a statute providing that "each county treasurer in this state shall on the first day of July, 1907, and annually on the second Monday in January thereafter, and at such other times as he may deem necessary, designate one or more banks in the state as depositary or depositaries of all public funds," the court said:

"The word 'shall,' as here used, relates rather to the act of designation in the first instance; and the use of the word 'annually' should be read in connection with the words 'and at such other times as he may deem necessary,' as applying to new designations, and not as indicating a legislative intent that such designations should be for one year only, and should cease to be effective at or before the time fixed for subsequent designations."

It is further said:

"In the absence of language limiting the designation to the term of one year, or requiring a complete redesignation each year, it seems plain that the legislature intended that any designation, when made, should continue indefinitely until the parties interested should take steps to terminate the relation."

The statute of the state of Wisconsin under consideration in *Manitowoc County v. Truman,* 91 Wis. 1 (64 N. W. 307), provided that the county board "may annually at their first meeting, or within the month of June, and as often thereafter as they shall determine, select some bank, banks, or banking association" as a depository of county funds. Upon the contention that such power could only be exercised for a single year, the court refused to hold that the word "annually" should be con-

strued as a mandatory requirement that a new selection of a depository must be made at the expiration of every year.

In *State Nat. Bank v. Commonwealth*, 129 Ky. 637 (112 S. W. 678), the court said:

"The statute, however, is absolutely silent upon the question of how long such depository shall continue to act as such. We therefore conclude that, in the absence of an agreement specifically fixing the time, the relation continues during the mutual will of the state treasurer and the bank designated as depository."

A definite term, from January 3, 1921, to January 3, 1922, is fixed in the bond in question, and the obligation of the bond is that the bank shall, during the term, faithfully account for and pay, on legal demand, all moneys deposited with it.

The original resolution approving the bank as a place of deposit of county funds fixed the amount of the depository bond to be given by it at $100,000. The bond involved in this controversy is for but $50,000. The reduction was made, as has been said, at the instance of the bonding company; and the bond was expressly approved by the board of supervisors by appropriate action spread upon its minutes. The original designation and approval of the bank as a depository, and this approval of the amount of the bond, constituted a sufficient approval of the bank as a depository, and fixing of the amount that might be deposited. The statute itself provided that the bond must be in an amount equal to ten per cent more than the amount deposited.

III. On Friday, February 25, 1921, the treasurer deposited in the bank a cashier's check on the Wells-Dickey Trust Company, of Minneapolis, Minnesota, for $40,746.68, payable to the county treasurer. The check represented the proceeds of a sale of county bonds. It was indorsed to the order of the bank. Credit for the amount of the check was given by the bank on the account of the county treasurer, in whose name as treasurer the funds of the county on deposit in the bank were kept, and entered on the books of the bank and the pass book of the depositor. The testimony of the county treasurer in reference to this deposit is as follows:

3. BANKS AND BANKING: deposits: ownership of deposited draft.

"I told him [Mr. Egan, the assistant cashier] I had this check to deposit, and asked him how long it would be before he would have returns on that check. By returns I meant, how long it would take them to get the money. In regard to the length of time it would take to get these returns, Mr. Egan mentioned several days. I do not remember just how many; but I asked him if he would have returns by Monday or Tuesday, and he said, 'yes,'—that is, the Monday or Tuesday following. * * * I also told him that it was my intention to issue checks of $10,000 each to the other three banks of Emmetsburg, to distribute that amount—that much of the deposit—to the other banks, and leave in the Emmetsburg National Bank $10,746.68. Q. You told him, then, at that time, as soon as the returns came, you wanted $30,000 to go into the other three banks here in Emmetsburg? A. No; I didn't tell him that. I told him I would draw my check for $10,000 to each of the other three banks. * * * But it wasn't contingent on the collection of it. The bank never advised me that they had returns on the check."

On cross-examination, he testified:

"Nothing was said as to why I did not issue the checks to the other banks at the time the Wells-Dickey check was brought in to me. I asked Mr. Egan how long it would take to get his returns on those checks, and he told me about when; and I, out of consideration that there might be considerable stringency,—might be something of a hardship for any bank to pay such a check if I issued it simultaneously with the deposit,— that was the reason, and that was the consideration I gave that bank."

This is the only testimony as to the transaction. On Tuesday, March 1st, the treasurer drew three checks for $10,000 on the Emmetsburg National Bank, each payable to another bank in Emmetsburg. They were, before the close of business on that day, deposited in the several banks in whose favor they were drawn. They were presented to the Emmetsburg National Bank for payment on the following morning, but not paid, as the bank had earlier in the day suspended business. The checks were returned to the county treasurer unpaid, and the credit given him therefor by the several payee banks was canceled.

The check for $40,746.68 was by the Emmetsburg National Bank forwarded to the Cedar Rapids National Bank for collection and credit, on February 25, 1921. The Emmetsburg bank had an account with the Cedar Rapids bank; and on February 26th, the amount of the check, with other items forwarded with it, was credited to the account of the Emmetsburg bank; and on the morning of the 27th, a daily transcript, showing such credit, was mailed to the Emmetsburg bank. The Cedar Rapids bank forwarded the check to the Federal Reserve Bank of Minneapolis, for collection and credit to its account with the Federal Reserve Bank at Chicago. The check was paid by the Wells-Dickey Trust Company on February 28th; and on March 2d, the Cedar Rapids bank received notice, under date of March 1st, from the Federal Reserve Bank at Chicago, that its account had been credited with the amount of the check. The balance to the credit of the Emmetsburg bank with the Cedar Rapids bank, prior to the deposit in question, was $2,228.33. After the deposit, which, as has been said, included other items, in addition to the Wells-Dickey check, the balance was $43,089.10. The balance to the credit of the Emmetsburg bank on February 28th was $35,877.97, and on March 1st, $38,272.98. On March 2d, a draft for $5,000, drawn by the Emmetsburg bank, and some other small items, were charged against the account, and a small amount credited to it, leaving a credit balance of $33,299.25, which was thereafter turned over to the receiver.

The contention of appellants in respect to the Wells-Dickey check for $40,746.68 is that the amount of it constituted a trust fund, for which the county, and the bonding company by assignment and subrogation, were entitled to have a preference in the distribution of the assets of the bank, (1) because the check was taken by the bank for collection, and the relation of debtor and creditor did not arise, and (2) that, if it was a deposit, the bank was insolvent, and known by its officers to be so when the deposit was received. It is also insisted that, at least to the extent of $30,000, the aggregate of the three $10,000 checks drawn by the treasurer in favor of the other Emmetsburg banks, the bank was but a collector, and that a trust relation existed.

Whether checks or drafts taken by a bank from a customer and credited to his account are received as a deposit, and the

bank becomes the owner of the paper, or are merely taken for collection, and the bank is but the agent of the depositor, depends, in the absence of an express agreement, upon the intention of the parties, as disclosed by the circumstances of the transaction. Where a customer of a bank indorses to the order of the bank checks or drafts, and is given credit for the amount thereof upon his account, as cash, and has the right to check against the credit so given, in the absence of an agreement or understanding to the contrary, or proof of circumstances from which such an understanding may be inferred, the presumption is that title to the paper passes to the bank; and the relation of debtor and creditor is created. And the mere fact that the bank has a right to cancel the credit and charge back to the customer the amount for which credit was given, if the paper is not paid, is not alone sufficient to show that it was taken for collection. The exercise of such a right is no more than the enforcement of the depositor's liability, as the drawer or indorser of dishonored paper. This subject was considered at some length in the recent case of *Acme Hay & Mill Feed Co. v. Metropolitan Nat. Bank*, 198 Iowa 1337, where the authorities will be found cited, and where our adherence to the doctrine stated above as being the rule, not only of our own prior decisions, but that supported by the decided weight of authority, is announced.

Appellants rely upon the conversation at the time of the deposit of the Wells-Dickey check, and the fact that the treasurer did not draw his checks for the $30,000 until later, and the practice of the bank to charge back to the account checks deposited by the treasurer that were not paid, as establishing that the check was taken by the bank merely for collection. The conversation, and the circumstances surrounding the deposit, are not, it seems to us, susceptible of such a construction. There was clearly no agreement that the treasurer would not check upon the account, nor any question of his right to do so immediately. On the contrary, it is plain that his forbearance to issue the checks for $30,000 immediately was entirely voluntary, and merely out of consideration for the bank, and in view of the prevailing stringent money market. The custom of the bank to charge back uncollected paper is, as has been said, but the exercise of a right it would have in any event, and is not con-

trolling. *Walker v. Ranlett,* 89 Vt. 71 (93 Atl. 1054) ; *National Com. Bank v. Miller,* 77 Ala. 168; *Auto & Accessories Mfg. Co. v. Merchants' Nat. Bank,* 116 Md. 179 (81 Atl. 294) ; *First Nat. Bank v. McMillan Bros.,* 15 Ga. App. 319 (83 S. E. 149) ; Michie on Banks and Banking, Section 127 ; *Acme Hay & Mill Feed Co. v. Metropolitan Nat. Bank,* supra; and other authorities there cited.

Moreover, it cannot well be doubted that the bank treated the transaction as a deposit as of that date. Interest was allowed the county on ninety per cent of the daily balances in the account, as augmented by the amount of the check, from February 25, 1921, as shown by the bank's monthly statement to the treasurer on March 1, 1921. It is not conceivable that the bank allowed interest upon the amount of a check received merely for collection, prior to its actual collection. The payment of interest is a circumstance indicating the relationship of the parties and the right of the bank to use the deposit as its own funds. *Walker v. Ranlett,* supra; *In re Central Bank,* 23 Ariz. 574 (205 Pac. 915) ; *St. Louis & S. F. R. Co. v. Johnston,* 133 U. S. 566 (33 L. Ed. 683) ; *McNulta v. West Chicago Park Com.,* 99 Fed. 900. The bank also treated the credit given it by the Cedar Rapids bank as its own funds, and drew upon its account there for its own purposes, to an extent that reduced its balance with that bank to a sum less than the amount of the Wells-Dickey check. *Plumas County Bank v. Bank of Rideout, Smith & Co.,* 165 Cal. 126 (131 Pac. 360, 47 L. R. A. [N. S.] 552) ; *Goshorn v. Murray,* 210 Fed. 880; *In re Jarmulowsky,* 249 Fed. 319 (L. R. A. 1918 E 634) ; *Armour Packing Co. v. Davis,* 118 N. C. 548 (24 S. E. 365). There is nothing in the case of *Brown v. Sheldon State Bank,* 139 Iowa 83, cited by appellants, inconsistent with the conclusion here reached. In that case, a draft had been sent to a bank for collection and return; and it was said that cases where the collection items were sent with instructions to collect and credit to account, were not in point.

But, passing this, the transaction of the collection of the check was completed, and the collection made, before the Emmetsburg bank closed its doors. It was evidently never con-

4. BANKS AND
BANKING: de-
posits: owner
(?) or collector
(?) of deposited
draft.

templated by any of the parties to the transaction that the actual cash would reach the hands of the Emmetsburg bank. It forwarded the check to the Cedar Rapids bank, not for remittance, but for collection and credit upon its account there; and the latter proceeded to collect it through the Federal Reserve Bank of Minneapolis, and directed that the proceeds be deposited to its credit with the Federal Reserve Bank at Chicago. Although the Cedar Rapids bank received the check merely for collection and credit, and the credit it gave the Emmetsburg bank was provisional, yet the collection was in fact completed and the transaction closed by the Cedar Rapids bank's receiving credit upon its account at the Federal Reserve Bank at Chicago, not for the check, but for the proceeds of its collection. This was done by direction of the Cedar Rapids bank, and was such a disposition of the proceeds of the collection as it saw fit to make in the conduct of its own business. It could not have been heard to say that it had not received the proceeds of the check, or to have then questioned the credit given by it on the account of the Emmetsburg bank. When the collection was in this manner completed, and the right of the Emmetsburg bank to the credit it received at the Cedar Rapids bank for the amount of the check was thus made absolute and irrevocable, it unquestionably became the owner of the proceeds of the check, as fully as if they were in its vault in cash. When appellants say, as they must, to maintain their contention of a trust, that the proceeds of the check have been traced into the hands of the bank, it is only through the credit given it by the Cedar Rapids bank that this is done, and that transaction had been completed, and the Emmetsburg bank had used the credit, before it closed its doors. The mere tracing of the fund into the hands of the bank is not alone sufficient, of course, to establish a trust: that must depend upon the relation of the parties,—whether the bank was the owner of the fund and the debtor of the county, or merely a collector.

There is still another consideration that is equally fatal to appellants' contention upon this phase of the case. The most that could be claimed for the conversation at the time the check was taken by the bank is that the treasurer should have no right

to check against it until Monday or Tuesday following, and that, until that time, the bank was not, therefore, the debtor of the county for the amount of the check. That time had arrived before the bank closed its doors, and before the checks for $30,000 were drawn or presented.

In any view of the matter, whether the check was taken as a deposit of its amount or only for collection and deposit when collected, the relation of debtor and creditor existed between the bank and the county before the failure of the bank.

It is said that, since the amount of the Wells-Dickey check, together with the amount of county funds then on deposit with the bank, exceeded the amount the treasurer might rightfully deposit under the bank's depository bond, it must be presumed that the check was not intended to be deposited, but that the bank took it merely for collection. It would, perhaps, be a sufficient answer to this contention to say that the amount by which the deposit, when the bank suspended business, exceeded the amount that could be rightfully deposited under the depository bond, was allowed as a preferred claim. But certainly no such presumption would be sufficient to overcome the established facts that credit was given for the amount as a deposit, in the absence of any agreement that it was taken merely for collection; that the bank allowed interest on it from the date of deposit, and used the credit obtained for the check with the Cedar Rapids bank for its own purposes,—in short, that the parties treated it as a deposit; and the further fact that it was actually paid before the failure of the bank.

IV. The claim that the Emmetsburg bank was insolvent, and known to be so by its officers, at the time the deposit was received, presents a question of fact. We have examined the record with care, and reach the conclusion that

5. Banks and
   banking: in-
   solvency: fraud
   as basis for
   preference.

the claim cannot be sustained. The evidence offered by the appellants to establish the fact of insolvency is based largely on the reports of the receiver, the first of which was made three months after the bank closed. That it was insolvent then may be conceded; but there is much testimony to the effect that, due to conditions prevailing generally in that section of the state, and with reference to the assets of this particular bank, it might well have been

solvent on February 25th, and hopelessly insolvent on June 1st, when the receiver's report was made. The testimony seems quite conclusive that the bank was closed by action of the directors, not because of existing insolvency, but because of a lack of cash—working capital—with which to continue business, and the inability to increase immediately the cash resources of the bank. Its paper had not been dishonored, nor its depositors refused payment. But, if there may be any doubt, in the light of subsequent events, as to the actual condition of the bank at the time of the deposit, whether it then had enough assets to meet its liabilities as they became due in the ordinary course of business (*Fremont County v. Fremont County Bank,* 138 Iowa 167; *State v. Cadwell,* 79 Iowa 432; 7 Corpus Juris 731), we think it was not shown, either that the officers of the bank had knowledge of the insolvency of the bank, or that its condition was then such that they must be charged with knowledge that it would be unable to meet its obligations. Proof of such knowledge or of such a condition is essential to establish fraud on the part of the bank out of which a trust will arise, entitling the depositor to a preference. *Steele v. Commissioner of Banks,* 240 Mass. 394 (134 N. E. 401, 20 A. L. R. 1203), and cases cited in notes.

It is claimed that the relation of debtor and creditor between the bank and the county never existed with reference to the $30,000 that was to have been put in the other banks, and that, as to so much of the amount of the Wells-Dickey check, the bank was simply to act as collector. We are of the opinion that the evidence does not support the contention that there was any agreement between the treasurer and the bank that the $30,000 was to be devoted to any particular purpose. At most, it shows that the treasurer declared his intention to transfer part of the fund or deposit to other banks. It was not in the nature of a special deposit; the bank undertook no special duty in respect to the $30,000; it was merely a part of the general deposit, and subject to any checks which the treasurer might draw against it. We see nothing in the transaction from which it could be found that, as to a part of the amount of the check, the bank was but a collector, when it was all deposited in the general account, and the bank allowed interest on all of it. A deposit upon which

interest must be paid, is not a special deposit. *McNulta v. West Chicago Park Com.,* supra; *In re Central Bank,* supra.

What has been said above disposes of the contention that the court improperly overruled appellants' motions to strike the plea of estoppel interposed by appellee.

We have endeavored to give to the questions presented the careful consideration which their importance requires, and reach the conclusion that the judgment must be, and it is,—*Affirmed.*

ARTHUR, C. J., and EVANS, PRESTON, STEVENS, and FAVILLE, JJ., concur.