L. A. ANDREW, State Superintendent of Banking, Appellee, v. CITIZENS' STATE BANK OF GOLDFIELD, Appellee; TRESSA TRUMBAUER, Intervener, Appellant.

NOVEMBER 20, 1928.

REHEARING DENIED JANUARY 23, 1929.

*Edwards, Longley, Ransier & Harris,* for appellant.

*Hobbet & Blue,* for appellee.

EVANS, J.—I. The Citizens' State Bank of Goldfield closed its doors on April 19, 1926. In due course, the superintendent

of banking was appointed as its receiver, and took charge thereof as such. This bank had been in operation many years, with a capital of $25,000 and a purported surplus of $75,000. Its active manager was its cashier, B. W. McElhinney, who owned 198 of its 250 shares of stock. Other stockholders were his two sisters, Mrs. Hanna and Mrs. Trumbauer. The latter was its president, and a director, and had been such for many years. She did not, however, reside in Goldfield, but in Waterloo, where her husband was engaged in the banking business, and where she assisted him. She was a woman of means, and of extensive business experience in banking lines, having been president of a bank in Waterloo, prior to her connection herewith.

In order to get before us the general nature of appellant's contention here, we avail ourselves of the following concise statement made in her brief:

"The Citizens' State Bank has been in operation at Goldfield for many years. B. W. McElhinney has always been its cashier, owning 198 shares, which is more than three fourths of its capital stock, and completely dominating its business affairs. He has been a helpless cripple since 1921, being paralyzed from the waist down, and, as is usually the case with those who are stricken in later life, became somewhat intolerant of opposition. For a number of years, his sister. Tressa Trumbauer, owning 15 shares, who is the appellant, has been a director and the nominal, but inactive, president of the bank, and his sister Mrs. E. J. Hanna, owning 21 shares, has also been a director. His wife, Fanny McElhinney, owning 6 shares, has also been a director, giving him, with his two sisters and his wife, a majority of the directors, and who, with his mother-in-law, were the heaviest depositors in the bank, at times representing nearly one quarter of the entire amount of deposits.

"On April 1, 1925, his sister Tressa, the appellant herein, had on deposit more than $19,000. His sister Mrs. Hanna had $40,000 in certificates of deposit, and when the bank closed, his mother-in-law was a depositor of $30,000. His wife had a small checking account and a certificate of deposit for $3,000. None of the directors of the bank, with the exception of Troyer, were borrowers from the bank or indorsers for other borrowers.

"On March 24, 1926, the bank was a going, prosperous con-cern. None of its obligations had been or were at that time in default, and the bank was not in any manner pressed for money. The bank was not in a failing condition, and, on the contrary, it had cash and other quick assets of nearly $75,000 on hand, which was $25,000 more than for many months previously, as well as nearly $300,000 of admittedly good commercial paper. All ques-tionable bills receivable had been fully cleaned up in 1924 by the cashier, who had borrowed $72,000 from Mrs. Trumbauer and put it into the bank to replace those notes, and which abso-lutely took out all objectionable notes. The failure of the only other bank in Goldfield and the one in Eagle Grove had left the Citizens' State Bank without competition, and with prospects for increased and prosperous business. The financial condition of the bank had been steadily improving, and the healthy and con-tinued growth and strength is shown by its bills payable account. In August, 1924, it had $60,000 of bills payable outstanding, and during the following year of 1925, the bank paid off $20,000 of its debts in March, and another $5,000 in September of that year. By January of 1926, the bank had reduced its bills pay-able to $25,000, which was held by the Illinois Merchants Trust Company of Chicago. That Chicago bank was a very unsatis-factory creditor, which the bank wanted to get rid of."

From the testimony of Mrs. Trumbauer and Christiansen, the assistant cashier, it appears that, on March 22, 1926, the intervener came to Goldfield and attended a meeting of the board of directors that evening; that she had on deposit at that time approximately $16,000; that for some years she had car-ried deposits amounting to $10,000 and up; that, from time to time, she converted her deposits into real estate mortgages, pro-cured for her by her brother; that she was allowed interest on her deposits at 5 and 5½ per cent; that, on March 24th, she entered into an arrangement with the cashier whereby she was to take the note of the bank for $25,000, to be secured by col-lateral, which was designated and set apart, and that such ar-rangement was to be consummated on April 1st; that a note was then and there executed, under date of April 1st, and that the collateral was then and there set apart; that thereafter, she re-turned to Waterloo, and a few days later, left the state for a period of three weeks. Before leaving the state, she remitted to

her brother the approximate sum of $9,000, to make up the $25,000 loan. Such remittance was credited to her as a deposit, whereby she appeared upon the books of the bank as a depositor to the extent of $25,000. No entry was made upon the books of the bank, indicating the alleged transaction of March 24th, until April 15th. On that day, the deposit account of the intervener was charged with $25,000, and a corresponding entry was made, charging the bank with liability for bills payable. The argument of the parties is largely concentrated upon one question: Was the bank in fact insolvent on March 24, 1926; and did the intervener know, or ought she to have known, of such insolvency?

As to this question, it will not be practicable, within the appropriate limits of an opinion, to go into a discussion of the details of evidence bearing on the question of insolvency. The receiver introduced a considerable volume of evidence tending to show that the bank had been, in fact, insolvent for several years. The evidence, as such, involves no contradictions. The intervener rested her cause upon the testimony introduced by the receiver. Her contention is that the evidence was insufficient. Such evidence involved an examination of present assets, and the history of them in the bank records, and necessarily involved more or less judgment and opinion. This evidence disclosed that large lines of credit, including excess loans, had been extended to persons who had continuously defaulted in payment for a long period of time, and that such persons were now, and had been for a long time, insolvent. The evidence thus introduced tended to show that the present discounts of the bank included more than $200,000 worth of worthless notes, and most of these had a long history. The contention of appellant's brief that the financial condition of the bank had been steadily improving is not sustained by the record. It is suggested in such brief of appellant's that the bad paper was all taken out in 1924, when the cashier borrowed from the intervener the sum of $72,000, for the purpose of charging off bad paper. This is an implied admission that there was $72,000 of bad paper in 1924. There is no claim that the intervener or the cashier donated the $72,000 to the bank. Such amount of bad paper more than absorbed all of its capital of $25,000. The net value of the bank's assets was

not increased by the borrowing of $72,000, though such cash might enable the bank to continue as a going concern upon the credit thus obtained. That all the bad paper had not been taken out in 1924 is rendered evident by the great volume of bad paper now appearing therein, the most of which originated prior to 1924. The argument for appellant at this point is largely predicated upon the following proposition contained in her brief:

"It is a settled rule in this state, as well as in other jurisdictions, that a bank is insolvent *only* when it is unable to pay its depositors and other creditors in the ordinary and usual course of business."

The brief purports to support the foregoing proposition with the citation of our following cases: *Palo Alto County v. Ulrich,* 199 Iowa 1; *Fremont County v. Fremont County Bank,* 138 Iowa 167; *State v. Childers,* 202 Iowa 1377.

The cited cases do not support the proposition in the form in which it is stated. The error of the proposition is in the use of the word "only," above italicized by us. With such elimination, the proposition is sound. The brief quotes from *State v. Childers,* 202 Iowa 1377, the following:

"The question is not whether the assets * * * of the entity are of sufficient value to ultimately satisfy the claims of creditors in full. It is the settled rule in this state, as well as in other jurisdictions, that a bank is insolvent when it is *unable to pay* its depositors and other creditors *in the usual and ordinary course of business.*"

In that case, we held a closed bank to be insolvent even though it had assets equal in value to all its obligations.

If the proposition stated in the brief were to be sustained, then no proof of insolvency of a bank, while a going concern, could ever be made. We held expressly, both in the *Palo Alto County* case (199 Iowa 1) and in the *Fremont County* case (138 Iowa 167), that the insolvency of a going concern was a question of fact.

We have read the evidence in the case before us with great care. To our minds, no other conclusion is possible, upon this record, than that this bank was deep in insolvency on March 24th, and that the intervener knew it.

II. It follows from the foregoing that the intervener became a trustee. Such was our holding in *Leach v. Beazley*, 201 Iowa 337. The fact that she was an "inactive" president will not avail her as a way of escape. By her acceptance of the office, she clothed herself with its authority, and imposed upon herself its obligations. These obligations could not be met by merely neglecting them. She might delegate the activities of the office to another, but she was still president, and her authority as such was not abridged. She had access to, and authority over, the assets of her corporation. When the bank became insolvent in her hands, she became a trustee by operation of law, and not by her own volition. Nor could she avoid it, if she would. The beneficiaries of her trust were primarily the bank depositors. The transaction of March 24th involved the subject-matter of her trust. She stands upon her contract made with another officer of the bank, who is likewise a trustee. She can gain no personal advantage thereby. Figuratively speaking, a trustee is always in court, and his contracts involving the trust property are always subject to review by a court of equity. The spring lock of the ordinary contract is the "meeting of the minds" of the parties thereto. But a trustee's contract has no such lock. The criterion of his contract is the justness of the *quid pro quo*. He may not avail himself of any contractual advantage which, at the time, was detrimental to his beneficiaries. In so far as the transaction of March 24th was a loaning of money to the bank and a taking of security therefor, it was not inherently fraudulent. In so far, however, as it operated, and was intended to operate, to the advantage of the trustee, and to the corresponding detriment of the beneficiary depositors, it is subject to review in equity, and will be disapproved. It will be deemed constructively fraudulent to the extent of the injury inflicted by it upon the beneficiaries.

It appears from the evidence that this bank had borrowed from a Chicago bank the sum of $25,000, and had secured the same by collateral in double the amount. The intervener testified that the arrangement between herself and the cashier was that she should take the place of that creditor, and should thereby release the excessive collateral held by such creditor. She was willing to accept collateral in the approximate amount of

the debt. If such arrangement had been carried out in this transaction, it would have been quite unassailable. It would have operated to no detriment to the depositors. To carry out this proposed arrangement, she must needs have produced additional funds to the amount of $25,000. If deposits on hand were available to take up the note held by the Chicago bank, then the bank already had these, and could so use them. No further contract with the lender would be necessary for that purpose. The intervener did not take up the note of the Chicago bank, nor did she furnish the necessary funds for that purpose. She simply treated her present deposits as cash approximating $16,000, and furnished additional funds to the approximate amount of $9,000. The net effect of this performance was to increase the bills payable by $25,000, and to increase the cash assets by $9,000 only. The further effect of the transaction was that approximately $16,000 of the bank's assets were thereby transferred in the form of collateral, to secure to the intervener her existing deposits. She would have been justified in exacting collateral for the additional $9,000; she was not justified, as a trustee, in appropriating collateral to the security of her own deposits. To the extent of the latter, she acted to her own advantage, and to the detriment of the depositors. As already indicated, a trustee's position in a court of equity is not necessarily aided by the existence of a contract. Whether with a contract or without one, a court of equity will take account of what was done, and will approve or disapprove in whole or in part, according to the very right. This means that the trustee will not be permitted to take advantage to himself to the corresponding detriment of his beneficiaries unless there be some equitable reason which calls for the court's approval. The controlling facts in this case are that, on April 1st, as well as March 24th, the intervener was a depositor in this bank to the amount of $15,887.25. She loaned the bank an additional sum of $9,112.75. Exact equity requires that she be deemed a depositor to the extent of her deposit above stated, and that she be deemed a lender for the balance. Her beneficiaries got the full benefit of this loan, and no duty was violated in making it. The violation of her trust arose in her attempted conversion of her deposit into a secured loan. To this extent the decree of the lower court will be modified. If the intervener has realized cash from

collateral delivered to her, she will be permitted to apply such cash upon her indebtedness to the amount of $9,112.75, plus 5 per cent interest from April 1, 1926. She will be required to deliver all remaining collateral in her hands to the receiver. The receiver shall take the same charged with a lien in favor of the intervener to the amount herein stated. The receiver shall apply collections made by him on such collateral first to the payment of such debt. With this modification, the decree of the district court will be affirmed. The appellee will pay the costs of his own printing. All other costs in this court will be taxed to the appellant.—*Modified and affirmed.*

STEVENS, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.